# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| JOSEPH C. BAMFORD and YOUNG MIN BAN,<br><br>        Plaintiffs,<br><br>        v.<br><br>PENFOLD, L.P.; DELAWARE VALLEY REGIONAL CENTER, LLC; WEST 36TH, INC.; JOSEPH MANHEIM; and REATH & CO., LLC,<br><br>        Defendants.<br><br>DELAWARE VALLEY REGIONAL CENTER, LLC; JOSEPH MANHEIM; and REATH & CO., LLC,<br><br>        Counterclaim Plaintiffs,<br><br>        v.<br><br>YOUNG MIN BAN,<br><br>        Counterclaim Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)  C.A. No. 2019-0005-JTL<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OPINION

Date Submitted: March 25, 2022
Date Decided: June 24, 2022

David J. Margules, Elizabeth A. Sloan, Brittany M. Giusini, BALLARD SPAHR LLP, Wilmington, Delaware; Timothy D. Katsiff, Fred G. DeRitis, BALLARD SPAHR LLP, Philadelphia, Pennsylvania; *Counsel for Plaintiff Joseph C. Bamford.*

Jeffrey S. Cianciulli, WEIR GREENBLATT PIERCE LLP, Wilmington, Delaware; Peter N. Kessler, KUTAK ROCK LLP, Philadelphia, Pennsylvania; *Counsel for Plaintiff Young Min Ban.*

Bruce E. Jameson, Kevin H. Davenport, John G. Day, PRICKETT, JONES & ELLIOT, P.A., Wilmington, Delaware; Marc R. Rosen, Joshua K. Bromberg, KLEINBERG, KAPLAN, WOLFF & COHEN, P.C., New York, New York; *Counsel for Defendants West 36th, Inc., Joseph Manheim, and Reath & Co., LLC.*

William B. Chandler III, Shannon E. German, WILSON SONSINI GOODRICH & ROSATI, P.C., Wilmington, Delaware; *Counsel for Defendants Penfold, L.P. and Delaware Valley Regional Center, LLC.*

**LASTER, V.C.**

Delaware Valley Regional Center, LLC ("DVRC") manages specialized investment funds that enable foreign nationals to make investments in job-creating projects in the United States. By making a qualifying investment, a foreign national gains priority access to permanent residency status.

Joseph Manheim controls DVRC through West 36th, Inc. ("WestCo"), a Delaware corporation. WestCo serves as the managing member of DVRC, and the board of directors of WestCo (the "WestCo Board") functions as the governing board of DVRC. Manheim owns 70% of the equity in WestCo.

Manheim heard about the visas-for-investment program in 2011. In 2012, he formed DVRC and WestCo. Later that year, Young Min Ban started working with Manheim to develop the business. Joseph Bamford provided startup capital for the business.

In 2018, Manheim terminated Ban. Bamford was already frustrated that DVRC was not paying more in distributions, and he and Ban became allies. After Bamford filed this lawsuit against Manheim, Ban intervened and asserted similar claims.

Bamford and Ban allege that Manheim has committed extensive breaches of his duty of loyalty. The alleged misconduct falls into broad categories:

- Between 2017 and 2020, Manheim caused DVRC to pay excessive management fees to Reath & Co., LLC ("ReathCo"), a company that Manheim and his wife own.

- Between 2018 and 2020, Manheim caused DVRC to pay excessive compensation to his brother, Frank Manheim, who serves as the Chief Operating Officer of DVRC and as a member of the WestCo Board. Bamford and Ban contend that Frank received excessive compensation both due to his familial relationship with Manheim and as an inducement to support Manheim's self-dealing.

- Between 2018 and 2020, Manheim caused DVRC to pay excessive compensation to his friend, Albert Mezzaroba, who serves as general counsel to DVRC and as a member of the WestCo Board. Bamford and Ban contend that Mezzaroba received excessive compensation both due to his relationship with Manheim and as an inducement to support Manheim's self-dealing.

- In 2019 and 2020, Manheim caused DVRC to pay excessive compensation to Paula Mandle, who serves as a member of the WestCo Board, and who treats the job as a sinecure. Bamford and Ban contend that Mandle received excessive compensation as an inducement to approve excessive compensation for Manheim, Frank, and Mezzaroba.

- Manheim has caused DVRC to reimburse ReathCo for unjustified expenses.

Ban seeks a derivative recovery on behalf of DVRC equal to the total of Manheim's alleged defalcations. Bamford seeks an investor-level recovery equal to one third of Manheim's alleged defalcations. Both seek expansive equitable relief divesting Manheim of control over DVRC.

In this post-trial decision, the court finds that Manheim is liable for a portion of the challenged transfers. Judgment will be entered in favor of DVRC in the amount of $2,365,809.22. The court declines to award any remedy other than a derivative recovery for the benefit of DVRC.

## I.    FACTUAL BACKGROUND

Trial took place on June 8–11, 2021. The parties introduced 2,192 exhibits and lodged twenty-three deposition transcripts. Five fact witnesses and six expert witnesses testified live.[1]

---

[1] Citations in the form "[Name] Tr." refer to witness testimony from the trial transcript. Citations in the form "[Name] Dep." refer to witness testimony from a

The record presents considerable difficulties. The entities at issue are small and closely held. From 2012 until 2018, Manheim and Ban were the two individuals most heavily involved in the business; Bamford was an outside investor and not involved in the day-to-day operations. Manheim and Ban are now on opposite sides of this dispute, and they offered conflicting testimony on numerous issues. Bamford, Ban, and Manheim all had their credibility impeached successfully on various points.

The documentary record is often unclear. From 2012 until 2016, the first four years of the entities' existence, the business operated in start-up mode. Neither Manheim nor Ban paid close attention to corporate formalities. Their main concern was to structure their affairs to minimize their personal tax liabilities, and the records that exist show efforts to manipulate transactions for that purpose.

In June 2016, Manheim, Ban, and Bamford reorganized the entities and their ownership stakes (the "Reorganization"). Unfortunately, they did so through two poorly drafted agreements that they created themselves, and they backdated one of the agreements for tax purposes so that the first step of the Reorganization appeared to take place in June 2015. Also in 2016, Manheim and Ban hired a law firm to help them clean up their records,

---

deposition transcript. Citations in the form "JX — at —" refer to a trial exhibit with the page designated by the internal page number or, if the document lacked an internal page number, by the last three digits of the JX number. If a trial exhibit used paragraph numbers, then references are by paragraph. The parties reached agreement on a limited number of stipulated facts in the pretrial order. Citations in the form "PTO ¶ —" refer to those stipulated facts. *See* Dkt. 339.

but that effort involved the creation of still more backdated documents that sought to fix problems in the entities' corporate structure. A more extensive effort to clean up the entities' records and professionalize their operations took place in 2017 and 2018, and it troweled another layer of documentation onto the edifice.

After trial, in an effort to pare down the case, the court made certain rulings and issued an initial set of post-trial factual findings. Dkt. 349 (the "Factual Findings" or "FF"). The court instructed the parties to treat the Factual Findings as established for purposes of post-trial briefing and argument, recognizing that to resolve the case completely would require additional factual findings.

The parties complied with the court's request. At the same time, they found ways to present evidence on the issues that the court already had decided. The parties' efforts have not caused the court to revisit any of the Factual Findings, although the court has sought to clarify certain findings and elaborate on its reasoning.

The following factual account reflects the court's determinations after weighing competing evidence, assessing the credibility of witnesses, and making determinations based on a preponderance of the evidence. The court has not repeated every finding that appeared in the Factual Findings, some of which addressed matters that are no longer at issue. The Factual Findings remain part of the court's post-trial findings of fact.

A.     **The Idea For The EB-5 Business**

In 2012, Manheim was working as the Chief Investment Officer for the Swarthmore Group, a boutique financial advisory firm. FF ¶ 1. As one of its lines of business, the

Swarthmore Group managed approximately $2.5 billion in institutional pension fund assets. Several of the firm's clients were Pennsylvania government agencies, including the Southeastern Pennsylvania Transportation Authority ("SEPTA"). Manheim Tr. 452–53, 488. Manheim had a personal connection to SEPTA: Pat Deon, SEPTA's Chairman, was a friend of Manheim's. *Id.* at 488.

During a lunch in Philadelphia at the Union League, Deon and other SEPTA officials discussed a recent debt financing where SEPTA had obtained advantageous terms because the financing involved "selling some Green Cards." *Id.* Manheim asked about the details and received his introduction to the EB-5 immigration program (the "EB-5 Program"). *Id.*

EB-5 is shorthand for "Employment Based Immigration: Fifth Preference." PTO ¶ 53. Administered by the U.S. Citizenship and Immigration Service ("USCIS"), the EB-5 Program enables foreign nationals who make significant job-creating investments in the United States to qualify for permanent residency. Although the minimum investment amount can vary, the standard amount until November 19, 2019, was $500,000. *See id.* ¶ 55. In order to qualify for the EB-5 Program, the investment must be in a commercial enterprise and create or preserve at least ten full-time qualifying jobs. *Id.* ¶ 56.

Foreign nationals do not have to make the qualifying investment directly. Instead, an entity that has been licensed as an "EB-5 regional center" can pool capital on behalf of multiple foreign investors, then make an investment on their behalf. *See id.* ¶¶ 53, 58. An EB-5 regional center is a public or private entity, engaged in the promotion of economic

growth, improved regional productivity, job creation, and increased capital investment in the United States, that has been approved by the USCIS to operate under the EB-5 Program. *See id.* ¶ 33.

After the lunch at the Union League, Manheim investigated the EB-5 Program. He learned more about it from Mezzaroba, a Pennsylvania lawyer with connections to senior officials at SEPTA and the Pennsylvania Turnpike Commission ("PTC"), where Deon serves on the board. Mezzaroba knew personally about the EB-5 Program from his stint as President and CEO of the Pennsylvania Convention Center, where he obtained $225 million in financing through the EB-5 Program. Mezzaroba Tr. 777–78.

Manheim learned that most regional centers sponsored investments in real estate. Manheim believed that an investment with a government agency like SEPTA or the PTC would be more attractive to foreign investors because of the lower risk that the investment would carry. One challenge was that government agencies, like SEPTA and the PTC, generally fund infrastructure projects with long-term debt. Foreign investors, by contrast, generally do not want to commit their money beyond the time necessary to receive a green card, which typically takes five years. *See* Manheim Tr. 488–90.

Manheim believed that he could solve the temporal mismatch by giving foreign investors the right to have their investment redeemed through an in-kind distribution of an interest in the loan to the government agency. *Id.* at 490–91. Manheim envisioned that the in-kind interest could be traded, much like a municipal bond, thereby solving the investor's need for liquidity. The structure would enable the government agency to borrow at a lower

interest rate because the foreign investors would subsidize the loan to obtain their green cards. *See id.* at 489–91. Manheim described the business model as a plan "to staple a Green Card to a muni bond and sell it onshore in Asia." *Id.* at 494.

After some additional diligence, Manheim decided that his plan could work. Through his connections with Deon and Mezzaroba, Manheim understood that the PTC could deploy the funds if he could assemble the investors. The consensus was that Manheim needed to provide at least $50 million in capital. *See id.* at 495.

## B. The Creation Of DVRC And WestCo

Manheim formed DVRC and WestCo on the same day in January 2012. JXs 24–25. He created DVRC as the entity that would become a USCIS-approved regional center, solicit investments from foreign investors, and deploy their capital in visa-qualifying investments with government agencies like SEPTA and the PTC (the "EB-5 Business"). He created WestCo to manage DVRC, and WestCo was the sole member of DVRC. FF ¶ 3(b). Manheim anticipated that WestCo also would pursue other entrepreneurial ventures.[2]

From the outset, Manheim failed to follow corporate formalities and did not keep good records. For example, Manheim did not adopt a limited liability company agreement

---

[2] WestCo did pursue other business opportunities. In 2013, Manheim used WestCo to provide advice to a friend who was trying to secure a contract with SEPTA, knew that Manheim had access to high-level decision makers, and believed that having Manheim involved would help his chances of success. Manheim Tr. 502. WestCo also provided services to Bamford, who paid WestCo to consult on matters relating to his family's business. *Id.* at 503–04. And WestCo engaged in some proprietary trading. *Id.* at 503.

for DVRC when he formed the entity. FF ¶ 3(c). An agreement exists, but it was not created until March 2016, after the EB-5 Business began to generate cash flow. *See* JX 27 (the "DVRC LLC Agreement"). At that point, Duane Morris LLP drafted a series of entity documents for WestCo, DVRC and the EB-5 Business, which Manheim implemented retroactively. *See, e.g.*, JXs 184–86.

When Manheim formed WestCo, he invited the two owners of the Swarthmore Group to join the business. Mandle, then the CEO of the Swarthmore Group, accepted. The other declined.

Initially, Manheim and Mandle each received 100 shares in WestCo, making them 50–50 owners, and they became WestCo's sole directors. *See* JX 50 at '001, '004. Both were officers, with Manheim serving as President and Treasurer, and Mandle serving as Vice President and Secretary. *Id.* at 3. In March 2012, Manheim and Mandle approved a resolution issuing Manheim 600 shares and Mandle 200 shares, giving Manheim a 70% ownership stake and Mandle a 30% ownership stake. *See* JX 33.[3]

---

[3] There are notable differences between the style and format of the written consent dated January 5, 2012 (JX 50) and the resolution of the WestCo Board from March 2, 2012 (JX 33). There are also tensions between the documents. The March 2012 resolution appoints Manheim and Mandle to slightly different officer positions than they assumed two months earlier as a result of the January 2012 board consent. Under the January 2012 consent, Manheim was President and Treasurer, and Mandle was Vice President and Secretary. Under the March 2012 resolution, Manheim was President and Managing Director, and Mandle was Treasurer and Secretary. The March 2012 resolution also seems to contemplate an initial issuance of shares, rather than a subsequent issuance of shares. It seems likely that in March 2016, when Manheim and Ban hired Duane Morris to clean up their corporate documents, the lawyers realized that Manheim drafted the March 2012

Mandle had no real involvement in the business. Manheim included her because she was his boss at the Swarthmore Group and because the EB-5 Business would benefit from the Swarthmore Group's connections.

## C.    Bamford Becomes Involved.

Manheim believed that he needed approximately $1 million in capital to launch the EB-5 Business. Manheim Tr. 496. In May 2012, Manheim obtained $500,000 in capital from East 63rd Limited ("EastCo"), a limited company organized under the laws of England and Wales. JX 39.

EastCo was a legacy company from a prior business venture with Bamford. The scion of a wealthy British family, Bamford met Manheim in 1995, when Bamford was sixteen years old, and Manheim was dating Bamford's sister. Several years later, when Bamford joined Alcoholics Anonymous and Narcotics Anonymous, his sister recommended that he ask Manheim to be his sponsor. Manheim agreed and served in that role for a decade. The two became close friends. They socialized regularly and travelled together. Their families also became close, and each named the other as the godfather to his children. Bamford Tr. 14–15; Manheim Tr. 461, 463–64, 607; PTO ¶ 21.

Over the years, Manheim and Bamford made several attempts at business ventures together. *See* Manheim Tr. 454, 465–66. In 2009, after the financial crisis, Manheim

---

resolution without having first satisfied the corporate formalities for appointing directors. The law firm created the earlier consents to fill in the gaps.

formed EastCo to trade in illiquid, distressed investments. *Id.* at 469–70. Bamford and another wealthy individual each contributed $500,000. In return, they each received 500,000 shares of common stock without voting rights and 33 shares of common stock with voting rights. Manheim held 33 shares of common stock with voting rights. PTO ¶ 41. EastCo thus had 1,000,099 shares outstanding, with Bamford and the other investor holding a fraction less than 100% of the economic interest. FF ¶ 4(b); JX 37. Manheim was its sole director. Manheim Tr. 471; PTO ¶ 42.

By 2012, EastCo had only invested approximately $200,000 of its capital, and it had achieved some gains on some of its investments. Manheim decided that the EB-5 Business would be a suitable investment for EastCo. *See* Manheim Tr. 496–97. After talking with Bamford, Manheim caused EastCo to provide WestCo with a $500,000 line of credit. JX 39 (the "2012 EastCo Loan"). In lieu of repaying the loan, WestCo could convert the borrowings into equity, and if WestCo drew the entire $500,000 and converted the full amount, then EastCo would receive shares equating to 49% of WestCo's fully diluted equity. FF ¶ 4(c).

The 2012 EastCo Loan thus conferred beneficial ownership of 49% of WestCo's equity, but its value was capped. If WestCo's value increased significantly, then Manheim could cause WestCo to repay the loan rather than converting it into equity. After the 2012 EastCo Loan, on a fully diluted basis, Manheim beneficially owned 35.7% of WestCo's equity (70% * 51%), and Mandle beneficially owned 15.3% (30% * 51%). *Id.* ¶ 4(d).

10

In September 2012, Bamford and Manheim caused EastCo to repurchase the other investor's shares. JX 46; *see* PTO ¶ 43. After the repurchase, Manheim continued to own 33 voting shares, and Bamford owned 500,000 non-voting shares and 33 voting shares. JX 54 at 4. Bamford thus held 99.99% of the economic ownership of EastCo, making him the beneficial owner of virtually all of the 49% of WestCo's equity that EastCo could receive upon conversion of the 2012 EastCo Loan. FF ¶ 4(e). The value of Bamford's ownership remained capped, because if the value of WestCo increased significantly, then Manheim could cause WestCo to repay the loan rather than converting it into equity.

**D.      Ban Joins The EB-5 Business.**

Shortly after Manheim formed WestCo and DVRC, Ban began working at the Swarthmore Group. Manheim tasked him with working on the EB-5 Business. *See id.* ¶ 5; Manheim Tr. 500–01.

In December 2012, Ban paid $100 to acquire 150 shares in WestCo from Mandle, leaving her with 150 shares. JX 49; Ban Tr. 288. Ban replaced her as a director, and he took over her roles as Secretary and Treasurer. *See* JX 28; JX 49. Manheim continued in the role of President and Managing Director. JX 49.

At that point, setting aside the potential dilution from the 2012 EastCo Loan, Manheim owned 700 shares, Ban owned 150 shares, and Mandle owned 150 shares. On a fully diluted basis, assuming the conversion of the EastCo loan, Bamford beneficially owned 49% of WestCo, Manheim owned 35.7% (70% * 51%), Ban owned 7.65% (15% *

11

51%), and Mandle owned 7.65% (15% * 51%). FF ¶ 7. Bamford's indirect interest remained subject to Manheim's ability to cause WestCo to repay the 2012 EastCo Loan.

**E.     The Early Days Of DVRC**

Manheim did not want to invest the time and money necessary to build the EB-5 Business unless he had a potential investment lined up. He also felt that having a potential investment would help him raise capital. He spent the latter part of 2012 and the first months of 2013 negotiating with the PTC. Manheim Tr. 506–07. With a deal in place, Manheim and Ban filed an application with the USCIS to become a regional center. *Id*.

During this time, Manheim was drawing on the 2012 EastCo Loan. On April 2, 2013, WestCo made the final draw. PTO ¶ 71. As its next source of funding, DVRC obtained a $500,000 loan from the Delaware Valley Regional Economic Development Fund, a non-profit foundation where Mezzaroba serves on the board of trustees. Manheim Tr. 504–05; Mezzaroba Dep. 80–85; PTO ¶ 72.

In May 2014, the USCIS granted DVRC approval to operate as an EB-5 regional center. With the approval in hand, DVRC could start raising money from foreign investors. FF ¶ 8. Manheim and Ban began connecting with agents based in Asia to source investors. Manheim Tr. 507–08. DVRC would need additional regulatory approvals from the USCIS before it could deploy the capital into a qualifying investment.

**F.     The Ban Profit-Sharing Agreement**

With the EB-5 Business entering a new phase, Ban asked Manheim for a written agreement regarding his interest in the EB-5 Business. They jointly drafted and executed a

12

letter agreement dated July 11, 2014, titled "Agreement with Young Min Ban regarding West 36th Incorporated and DVRC." JX 68 (the "Ban Profit-Sharing Agreement"). The agreement is poorly written, and its text is ambiguous. FF ¶ 10.

In substance, Manheim and Ban agreed to an equal division of the economic returns from WestCo and DVRC relating to the EB-5 Business. Ban only asked for 40%, but Manheim believed that it would be more fair and avoid disputes in the future if they had equal shares. Manheim Tr. 508–09. Manheim was not willing to give up control over the business, but he was willing to give Ban half of the economic returns. *Id.* at 509.

To implement that deal, they agreed on the three key points:

- First, they would be reimbursed for items directly related to the business of WestCo and DVRC, i.e., for legitimate business expenses.

- Second, they would true up any expenses not directly related to the business of WestCo and DVRC that they nevertheless ran through the business.

- Third, they would allocate distributions from WestCo and DVRC so that they each received an equal share.

FF ¶ 10.

The second deal point recognized that to obtain favorable tax treatment, both Manheim and Ban wanted to have DVRC and WestCo bear as many of their personal expenses as possible. But that created a risk that one of them would charge more personal expenses to the business than the other. They therefore agreed that "any salary payments and expense reimbursement for items not directly related to the business of West 36th and [DVRC] will be equal." JX 68 ¶ A. They subsequently agreed upon a total draw of $25,000

13

each per month, or $300,000 each per year. Any expenses that they ran through the business would be credited against this amount.[4]

The third deal point recognized that Manheim had a meaningfully greater equity stake in the business. DVRC's sole member was WestCo, and Manheim owned 70% of WestCo, while Ban owned 15%. Their agreement represented a commitment by Manheim to pay over to Ban a share of the cash flows he received from WestCo or DVRC. FF ¶ 10(c).

As a matter of economic substance, the Ban Profit-Sharing Agreement meant that Manheim and Ban each would receive $300,000 in annual compensation from the EB-5 Business, plus reimbursement of legitimate expenses, plus an equal stake in the profits of the business. *Id*. ¶¶ 10–11. Setting aside the potential dilution from the 2012 EastCo Loan, the agreement meant that Manheim would receive 42.5% of the profits, Ban would receive 42.5% of the profits, and Mandle would receive the remaining 15%. On a fully diluted basis that took into account the 2012 EastCo Loan, the allocation was as follows: Bamford 49%, Mandle 7.65%, Manheim 21.675%, and Ban 21.675%. *Id*. ¶ 11. Bamford's beneficial interest in WestCo remained subject to Manheim's ability to cause WestCo to repay the 2012 EastCo Loan.

---

[4] For example, if Manheim caused DVRC to pay the rent for his apartment at a cost of $2,000 per month, then that amount would be credited against his $25,000 and he would receive $23,000 instead of $25,000. The same was true for Ban. *See* JX 81; JXs 97–101; JX 128; Ban Tr. 261.

## G. The Creation Of ReathCo

In November 2014, Manheim formed ReathCo. Manheim Tr. 510. Manheim controls ReathCo, and he and his wife own the equity. PTO ¶ 30.

Manheim initially formed ReathCo to provide investment advice to a friend who had inherited more than $1 billion. Manheim Tr. 513; *see* Bamford Tr. 34; Ban Tr. 209. In return, Manheim's friend agreed to pay ReathCo an advisory fee of approximately $500,000 per year. Ban Tr. 209. Manheim envisioned that ReathCo would become the centerpiece of a larger financial advisory business. *Id.*; Manheim Tr. 514.

By the time he created ReathCo, Manheim's relationship with the Swarthmore Group had changed. He had joined the firm as part of a succession plan that contemplated Manheim buying out Mandle and her co-owner. During 2014, Manheim negotiated to purchase the business, but the two sides could not agree on price. Also during 2014, the EB-5 Business was transitioning from a side hustle into a more significant commitment. The time required to solicit investors for DVRC cut into Manheim's ability to devote time to the Swarthmore Group. *See* Manheim Tr. 511–13.

Manheim decided it was time to pursue the opportunities he had with ReathCo and DVRC. In December 2014, Manheim and Ban resigned from the Swarthmore Group.

## H. The Management Agreements

By the time they left the Swarthmore Group, DVRC had raised approximately $15 million from foreign investors. *Id.* at 524–25. But those funds could not be released from

15

escrow until DVRC received approval from the USCIS to make a qualifying investment. *Id.* at 518–19. DVRC therefore was not yet generating income.

WestCo had obtained capital from Bamford, and Manheim was using WestCo for some other businesses, but WestCo was not generating income consistently. ReathCo, by contrast, had revenue of $500,000 per year. Manheim therefore decided to use ReathCo as his central business vehicle. That way, ReathCo could issue paychecks to Manheim and Ban, provide them with health benefits, and cover their expenses. As long as WestCo had funds, Manheim would cause WestCo to reimburse ReathCo for those amounts. If WestCo did not have the money, then ReathCo and WestCo would accrue the amounts due as a loan from ReathCo to WestCo. Once DVRC started making money and making distributions to WestCo, then WestCo could pay back ReathCo. *See id.* at 515–17; JX 74.

Manheim and Ban anticipated that after DVRC became successful, then DVRC would pay ReathCo directly in the form of a management fee. They expected that once that day came, they would eliminate the WestCo payment obligation. *See* Manheim Tr. 515 ("And it was envisioned that we would probably end up migrating and getting rid of the West one.").

To document these concepts, Manheim caused ReathCo to enter into two management agreements (the "Management Agreements"). Both were dated December 21, 2014, and made effective as of January 1, 2015.

The first agreement was between WestCo and ReathCo. JX 77 (the "WestCo Management Agreement"). It committed WestCo to pay $600,000 per year to ReathCo. In

return, ReathCo agreed to provide "management services to West 36th as necessary for the day to day operations of West 36th." *Id.* The purpose of this agreement was to make WestCo responsible for the compensation that ReathCo was paying to Manheim and Ban. FF ¶ 14; Ban Tr. 215–16.

The second agreement was between DVRC and ReathCo. JX 78 (the "DVRC Management Agreement"). It committed DVRC to pay ReathCo a management fee equal to 0.25% of its assets under management ("AUM"). In return, ReathCo agreed "to provide management services to West 36th as necessary for the day to day operations of DVRC." *Id.*

Manheim picked 25 basis points because he thought it was a reasonable figure. He knew that the Swarthmore Group placed its clients in funds that charged fees ranging from 10 basis points to approximately 1% of AUM. The fees for fixed income investments were around 25 basis points. Manheim admitted that there "[w]asn't too much science attached to it." Manheim Tr. 523. DVRC intended to charge its foreign investors a management fee equal to 25 basis points of AUM, so that amount would act as a passthrough from the funds to DVRC to ReathCo. *See* Ban Tr. 214–15.

DVRC did not yet have AUM, and it would not have AUM until DVRC made its first USCIS-approved investment. By putting the DVRC Management Agreement into place, Manheim and Ban were planning for the future.

Manheim signed the Management Agreements on behalf of ReathCo. Ban signed on behalf of WestCo and DVRC.

Both Management Agreements provided for prorated payments on the first day of the month. Both provided that payments not paid on the due date "will accrue with 10% annual interest." JX 77; *accord* JX 78.

## I. Manheim Terminates The Management Agreements.

During the first half of 2015, tension grew between Ban and Manheim. The principal cause was the amount of funds that Manheim withdrew from the business for personal spending. Through the Ban Profit-Sharing Agreement, Manheim and Ban had agreed that they each would receive $300,000 in annual compensation, plus reimbursement of legitimate expenditures, but Manheim could not keep his personal spending within those limits. He withdrew additional amounts unilaterally to support his lifestyle. FF ¶ 20.

In an email sent on June 30, 2015, Ban projected that DVRC would run out of cash by the end of the 2015. JX 111 at 2. Manheim believed that with additional spending cuts, the cash they had was "enough to get the business through to June 2016 on life support." *Id.* at 1. Manheim also thought that if the USCIS did not give DVRC the approvals to make a qualifying investment by April 2016, then DVRC would lose its deal with the PTC, and the EB-5 Business would be a failure in any event. *Id.*

In his June 30 email, Manheim made specific commitments to reduce the cash burn associated with the EB-5 Business:

> As of June 30[th] (today) West 36[th] will cease to pay Reath & Company a management fee. I will not be getting compensated in any way by West / DVRC for anything I do going forward in the company. This is a condition of the additional Bamford money coming into the entity. The only thing that will be getting paid for by West 36[th] will be the Porsche as its lease runs out in April of next year. Reath & Company will be paying the office rent at

18

Rittenhouse square and for both Bloomberg's. Reath will also pay for my healthcare. If I am correct and $620k is the starting cash # for West etc – so please update me on the outstanding payables—then that is circa $51k per month to spend on getting this through the gauntlet.

I believe that West has paid more than 6 month's management fee to Reath so far this year—I will check the transfer's [sic] but you probably have that information to hand—whatever is in excess of the $300k paid so far this year to Reath will be a payable back to West 36th from Reath. The timing of this is most likely at year end given cash flow etc etc. Removing the payment relationship between the two companies is also sensible going forward from a management perspective and will provide better clarity for accounting and what not. . . .

We need to regardless of your's [sic] or my personal contractual arrangements move all the employees from Reath to West 36th. They are expense's [sic] of West 36th.

*Id.*

The parties dispute whether this email memorialized the termination of both Management Agreements or only the WestCo Management Agreement. Manheim maintains that he only terminated the WestCo Management Agreement. Ban maintains that Manheim terminated both Management Agreements.

Both accounts are plausible. Manheim testified that he was taking steps to limit the cash burn that had caused tensions with Ban. He pointed out that the management fee that WestCo paid ReathCo was part of the cash burn. Manheim said he cut off that payment obligation. He explained that the DVRC Management Agreement was not a source of expense because DVRC did not yet have AUM. Terminating the DVRC Management Agreement did not affect cash flow, so he said he had not terminated that agreement.

19

Ban understood that Manheim's email terminated both agreements.[5] He believed the termination had a broader administrative purpose, as Manheim's email explained. *See* JX 111 at 1 ("Removing the payment relationship between the two companies is also sensible going forward from a management perspective and will provide better clarity for accounting and what not."). He believed that Manheim's email addressed both WestCo and DVRC, not just WestCo. *See id.* ("I will not be getting compensated in any way by West / DVRC for anything I do going forward in the company.").

If the only evidence about what happened with the Management Agreements consisted of Manheim's June 30 email and the witness testimony from Manheim and Ban, then I would find Manheim's account more persuasive. But the parties' subsequent conduct provides convincing evidence to support Ban's version of events. In October 2015, Ban wrote an email to Manheim that referred back to the discussions that led to the termination email and which referenced both WestCo and DVRC, not just WestCo. *See* JX 129 at 2 (October 2015 email from Ban summarizing his understanding of the June 30 email; "I felt that [the] only thing I really won from our issues in June was that you agreed to not take any more money out of DVRC/W36"). Likewise, in April 2017, Ban wrote an email to DVRC's outside accountants in which he instructed them that a transfer of $100,000 from DVRC to ReathCo in December 2015 needed to be treated as a loan. JX 423 at 1. He again

---

[5] Ban Tr. 217 ("[T]hese agreements were canceled."); Ban Tr. 397 ("The Reath— the only DVRC-Reath management agreement that I was aware that actually existed at one point was May of 2014, which we agreed to get rid of and cancel in the middle of 2015.").

20

referred to both entities, not just WestCo. *Id.* ("Joe and I had previously contemplated a management contract between Reath and West36, but decided to keep Reath not involved in management of [West36] or DVRC."). Ban also cited budgets for the EB-5 Business that did not contemplate any management fees for ReathCo.[6]

Most significantly, as discussed later, Manheim, Ban, and Bamford spent the last months of 2015 and the beginning of 2016 negotiating over the Reorganization. Those discussions specifically addressed the allocation of cash flows from DVRC, and they proceeded on the assumption that (i) Manheim and Ban each were receiving $300,000 in compensation, plus benefits and the reimbursement of legitimate expenditures, and (ii) Manheim, Ban, and Bamford would receive equal shares of the net income from the EB-5 Business, after expenses that included officer compensation. No one mentioned the ReathCo Management Agreement or suggested that ReathCo would receive 0.25% of AUM off the top. In the Factual Findings, the court found that Manheim did not make any misrepresentations in connection with the Reorganization. *See* FF ¶ 51. The court could not make that finding if the ReathCo Management Agreement remained in existence.

As of June 30, 2015, neither the WestCo Management Agreement nor the ReathCo Management Agreement remained in effect. *Id.* ¶ 21.

---

[6] *See* JX 1628; JXs 1716–17; Ban Tr. 220–24, 301.

**J.    Manheim Obtains Additional Financing.**

To help DVRC survive until it received approval to make a qualifying investment, Manheim sought additional capital from Bamford. The cash infusions were documented in 2015 in the form of a second convertible loan agreement between EastCo and WestCo. JX 131 (the "2015 EastCo Loan"). Under its terms, EastCo committed to extend an additional $500,000 in credit to WestCo, with $400,000 of that amount already drawn. EastCo had the option to convert the full amount of the loan into a minimum of 2,900 WestCo shares and a maximum of 4,000 WestCo shares, depending on WestCo's valuation at the time of the conversion. JX 115.

The effect of the conversion right was to give EastCo a greater level of beneficial ownership in WestCo. Because Bamford already beneficially owned virtually all of EastCo's equity (subject to Manheim's ability to cause EastCo to repay the 2012 EastCo Loan), the conversion right also had the effect of increasing Bamford's level of beneficial ownership in WestCo. Depending on the valuation of WestCo, Bamford's beneficial ownership ranged from 67.1% and 79.4% of WestCo's equity.[7] At the upper end of that

---

[7] At the time, WestCo had 1000 shares outstanding and had committed to issue a 49% interest to EastCo if WestCo converted the 2012 EastCo Loan into equity. The 2012 EastCo Loan thus effectively represented an interest in 961 shares. Consequently, on a fully diluted basis, the 2015 EastCo Loan represented beneficial ownership of between 59.7% of WestCo's equity at the low end (2,900 / 4,861) and 67.1% of WestCo's equity at the high end (4,000 / 5,961). Adding the low-end figure for the conversion of the 2015 EastCo Loan to the 961 shares from the 2012 EastCo Loan resulted in Bamford having beneficial ownership of 79.4% of WestCo's equity (3,861 / 4,861). FF ¶¶ 17–18.

range, Mandle beneficially owned 3.1% of WestCo's equity (150 / 4,861). Under the Ban Profit-Sharing Agreement, Manheim and Ban shared equally in the remaining 17.6% of the economic returns, for 8.8% each. *Id.* ¶ 18.

Bamford funded the 2015 EastCo Loan by purchasing 500,000 shares of non-voting EastCo B common stock at a price of $1 per share. PTO ¶ 44. Under a stockholders' agreement, Bamford held a mandatory redemption right that enabled him to compel EastCo to redeem his shares if he disagreed with any of Manheim's decisions. JX 107 ¶ 6.6.

**K. DVRC Receives Approval To Make Investments.**

In February 2016, the USCIS granted DVRC approval to make qualifying investments. That meant that DVRC could deploy the capital it had received from the foreign investors. DVRC also could begin charging fees.

DVRC's first investment fund was DVRC Pennsylvania Turnpike LP ("PTC I"). As of May 2016, PTC I was fully subscribed and closed to new investors. There were 400 investors in PTC I, each of whom contributed $550,000 to the fund. Of that amount, $500,000 was for a qualifying investment under the EB-5 Program, and $50,000 was a syndication fee payable to DVRC, which DVRC had to share with the agents based in Asia who located the investors. In total, the investors contributed $200 million for qualifying investments and $20 million for syndication fees. PTC I loaned the $200 million to the PTC at an interest rate of 2% per annum. The PTC used the funds for a highway construction project. *See* PTO ¶¶ 60–61, 63, 66.

DVRC followed PTC I with DVRC SEPTA II LP ("SEPTA II"), which used the same structure as PTC I. As of November 2019, SEPTA II was fully subscribed and closed to new investors. There were 479 investors in SEPTA II who contributed a total of $263.45 million, with $239.5 million for qualifying investments and $23.95 million for syndication fees. SEPTA II loaned the $239.5 million to SEPTA at an interest rate of 2% per annum. SEPTA used the funds to improve its public transportation systems. *See id.* ¶¶ 60–61, 64, 66.

DVRC followed SEPTA II with DVRC Pennsylvania Turnpike II LP ("PTC II"). As of January 2021, PTI II was partially subscribed and remained open to new investors. At the time, there were 367 investors in PTC II who had contributed a total of $201.85 million, with $183.5 million for qualifying investments and $18.35 million for syndication fees. To date, PTC II has loaned $183.5 million to the PTC at a rate of 2% per annum. The PTC has used the funds for highway construction projects. *See id.* ¶¶ 60–61, 65–66.

DVRC serves as the general partner of each fund. All fund expenses are born by the investors in the funds. *See* Ban Tr. 271–72. Under the agreements governing the funds, DVRC has a profit interest that entitles it to receive 75% of the profits that each fund generates. FF ¶ 16. Each fund's expenses include a management fee for DVRC equal to 0.25% of AUM. *Id.*

## L. The Reorganization

With the prospect of fee-generating investments on the horizon, Manheim, Ban, and Bamford began discussing the Reorganization in fall 2015. At that time, DVRC remained

a wholly owned subsidiary of WestCo. The economic returns from DVRC, however, were divvied up through a complex series of arrangements that included (i) Manheim, Ban, and Mandle's status as record owners of stock in WestCo, (ii) Bamford's beneficial interest in WestCo through the 2012 and 2015 EastCo Loans, and (iii) the Ban Profit-Sharing Agreement. FF ¶¶ 23–25.

After DVRC received approval to make investments in February 2016, discussions about the Reorganization intensified. Bamford was interested in holding his interest through an entity rather than personally, which he believed would help minimize his taxes in the United Kingdom. *See, e.g.*, JX 168; JX 174. A major consideration was proposed federal legislation that would have prohibited foreign control or ownership of an EB-5 regional center. *See* JX 126. The parties believed that they could avoid any risk posed by Bamford's ownership in DVRC by creating a structure in which Bamford would hold a passive stake through a holding company. FF ¶ 26.

On March 18, 2016, Manheim formed Penfold, L.P., a Delaware limited partnership, with the expectation that it would serve as the new holding company for DVRC. When Manheim formed Penfold, he identified ReathCo as its general partner on the certificate of formation. It was a logical entity for Manheim to use, but Bamford and Ban had not agreed on ReathCo serving in that role. Manheim, Ban, and Bamford also had not agreed on the terms of Penfold's limited partnership agreement. *Id.* ¶ 27.

To carry out the Reorganization, Manheim and Ban drafted two agreements. The first agreement admitted Manheim, Ban, and Bamford as members of DVRC. *See* JX 452

25

(the "Admission Agreement"). The second agreement effectuated a contribution of their member interests in DVRC to Penfold. JX 252 (the "Contribution Agreement").

Manheim and Ban prepared both agreements in June 2016. FF ¶¶ 28, 42. For tax purposes, Manheim and Ban tried to backdate the agreements as if they had been executed on June 1, 2015. *Id.* ¶¶ 28, 43. They did that for the Admission Agreement, which was made effective among the parties as of June 1, 2015. *Id.* ¶ 48. They were not able to do that for the Contribution Agreement, because Manheim had not formed Penfold until March 2016. *Id.* ¶ 43. The Contribution Agreement therefore remained dated as of June 10, 2016. Manheim Tr. 556–57.

### 1.    The Admission Agreement

The Admission Agreement contained a series of significant provisions. Three are straightforward:

- In paragraph 1, DVRC and WestCo admitted Manheim, Bamford, and Ban as "Non Managing Member[s]" of DVRC. JX 452 ¶ 1.

- In paragraph 2, the parties agreed that "the Managing Member and Non Managing Members shall have and own the membership interests, and capital accounts set forth in Exhibit B." *Id.* ¶ 2.

- In paragraph 3, the parties agreed that the DVRC LLC Agreement would constitute the operating agreement of DVRC. *Id.* ¶ 3.[8]

---

[8] Technically, the Admission Agreement adopted an agreement that appeared in the form attached as Exhibit C as DVRC's operating agreement. The record does not contain a version of the Admission Agreement that attaches an Exhibit C, but the circumstantial evidence indicates that this was a reference to the DVRC LLC Agreement that Duane Morris prepared in March 2016.

In addition to these provisions, the parties agreed in paragraph 4 of the Admission Agreement to amend the DVRC LLC Agreement to add a new Article XIII, addressing "Profits, Losses, and Distributions." *Id.* ¶ 4. The new article contained two provisions: Sections 13.01 and 13.02.

Section 13.01, titled "Allocation," stated: "For financial accounting and tax purposes the Cash Flow shall be determined on an annual basis and shall be allocated to the Members in proportion to each Member's relative interest in the Company as set forth in Exhibit 1 and after allocating for appropriate Officer Compensation." *Id.* ¶ 4(b) (the "Allocation Provision").

The phrase "appropriate Officer Compensation" referred to the compensation that Manheim and Ban were receiving for running the business. Under the Ban-Profit Sharing Agreement, Manheim and Ban were receiving a salary of $300,000 per year plus benefits and the reimbursement of legitimate expenditures. Bamford understood that this was the level of compensation and benefits that Manheim and Ban were receiving and would continue to receive. The Allocation Provision did not cap the amount of officer compensation that DVRC could pay. It rather sought to confirm that the salary and benefits that Manheim and Ban received would be treated as compensation and not as a distribution of cash flow. The provision demonstrates that the parties discussed the topic of the cash flows that each individual was receiving and could be expected to receive going forward.

Section 13.02, titled "Distributions," stated: "The Managing Member shall determine and distribute available Cash Flow. Available Cash Flow, as referred to herein,

shall mean the cash of the Company available after appropriate provision for expenses and liabilities, as determined by the Managing Member." *Id.* (the "Distribution Provision"). The Distribution Provision thus authorized WestCo, as the Managing Member, to determine the "appropriate provision for expenses and liabilities." *Id.* Once WestCo had made that determination, the Distribution Provision required that WestCo distribute the available cash flow to the members. Like the Allocation Provision, the Distribution Provision did not cap the amount of expenses or liabilities that the Company could incur, and it granted WestCo the authority to exercise judgment when determining what reserves were necessary. The provision demonstrates that the parties discussed the topic of distributions and established an expectation that available cash flow would be distributed to the members.

Manheim and Ban separately agreed that "[u]pon the signing" of the Admission Agreement, the Ban Profit-Sharing Agreement terminated. JX 89. Because they backdated the Admission Agreement, the reference to "[u]pon the signing" is ambiguous. They logically intended to refer to June 1, 2015, consistent with their desire to make the new equity-ownership arrangement effective as of that date. FF ¶¶ 41, 48.

After the execution of the Admission Agreement, (i) WestCo owned a 10% interest in DVRC as its managing member, and (ii) Manheim, Ban, and Bamford each owned a 30% interest in DVRC as non-managing members. The Admission Agreement did not elaborate on the distinction between managing and non-managing members or define the

28

rights of each. The DVRC LLC Agreement did not shed light on those subjects either, because it continued to contemplate a single-member, member-managed LLC.

## 2. The Contribution Agreement

The second agreement that Manheim and Ban prepared was the Contribution Agreement. The recitals to the Contribution Agreement stated:

> WHEREAS, Parties [sic] currently hold interest in Delaware Valley Regional Center, LLC ("DVRC") Delaware [sic] limited liability company;

> WHEREAS, each of Parties [sic] is the record and beneficial owners [sic] of 1/3 of all of the share capital, securities, shares or other equity interests of any kind (collectively, Parties own 100% of Penfold) of Penfold [sic]; and

> WHEREAS, Parties [sic] desires [sic] to make a contribution of their membership interests held collectively by the Parties in DVRC to Penfold, subject to the terms and conditions herein below.

JX 252 at 1. The only parties to the Contribution Agreement were Manheim, Bamford, Ban, and Penfold itself.

The only substantive provision of the Contribution Agreement provided as follows: "Effective upon the execution of this Agreement, Parties [sic] hereby will contribute to Penfold, [sic] their membership interests held in DVRC." *Id.* ¶ 1.

Through the Contribution Agreement, the parties agreed that the limited partners owned 100% of the equity interest in Penfold. As a consequence of this agreement, the general partner interest did not carry any economic rights. Manheim Tr. 684–85.

## 3. The Signing Of The Agreements

Manheim traveled to the United Kingdom in early June 2016. During the trip, Manheim visited Bamford, and they signed both agreements. FF ¶¶ 45–46.

Bamford and Manheim also amended the 2012 and 2015 EastCo Loans to eliminate their convertibility features. PTO ¶ 74. That step was necessary to avoid the risk posed by pending federal legislation addressing foreign ownership of EB-5 businesses, because the two loans gave EastCo, a foreign entity, beneficial ownership of at least 79.4% of WestCo's equity (subject to WestCo's ability to repay the 2012 EastCo Loan). If WestCo remained the managing member of DVRC, as contemplated by the Admission Agreement, then a foreign entity could be deemed to control DVRC. FF ¶ 49.

Bamford made major economic concessions by executing those agreements. Before the restructuring, Bamford beneficially owned a fully diluted equity stake in WestCo of at least 79.4%. Because WestCo owned 100% of DVRC, Bamford beneficially owned a similar percentage in DVRC. But those figures exaggerate matters to some degree, because WestCo had the ability to repay the 2012 EastCo Loan and eliminate the right to convert shares comprising 49% of WestCo's equity. With the USCIS approving DVRC's ability to make qualifying investments, the value of DVRC and WestCo might well have made it rational for WestCo to repay the 2012 EastCo Loan. Without the 2012 EastCo Loan, Bamford beneficially owned a 59.6% interest in DVRC ((79.4 - 49) / 51). Through the Reorganization, he accepted a 30% interest in DVRC, which he held through Penfold. Although that exchange might seem economically detrimental, it also negated the threat of potential federal legislation addressing the ownership of an EB-5 business by a foreign national and facilitated Bamford's goal of tax minimization. *See id.*

Ban benefited from the Reorganization. Before executing the agreements, he owned rights to 8.8% of the fully diluted returns from WestCo and DVRC. After executing the agreements, Ban owned rights to 31.5% of the returns from WestCo and DVRC. He beneficially owned a 30% equity stake in DVRC through Penfold, and with Bamford having waived the convertibility feature on the 2012 and 2015 EastCo Loans, Ban's 150 shares in WestCo again represented 15% of its equity, giving him beneficial ownership of an additional 1.5% stake in DVRC. Relative to Manheim, Ban lost ground, because Ban gave up his rights under the Ban Profit-Sharing Agreement. What Ban gained was clear documentation of his economic interests, which is something he craved. *See id.* ¶ 50.

What the Reorganization did not contemplate was the DVRC Management Agreement. By giving ReathCo a right to a management fee equal to 0.25% of AUM, the DVRC Management Agreement affected the allocation of the returns from the EB-5 Business that Manheim, Ban, and Bamford sought to allocate through the Admission Agreement and the Contribution Agreement.

There is no evidence that the parties took into account the DVRC Management Agreement when negotiating the Reorganization. Bamford understood that Manheim and Ban were receiving salaries of $300,000 per year, plus reimbursement of legitimate business expenses. No one suggested that through ReathCo, Manheim would receive additional amounts because of the DVRC Management Agreement. Whether that agreement remained in effect had particular significance for Ban, because as long as the Ban Profit-Sharing Agreement remained in effect, he received half of the economic

31

benefits it generated. Once Ban agreed to terminate the Ban Profit-Sharing Agreement, all of the economic benefit from the DVRC Management Agreement went to Manheim.

The DVRC Management Agreement would obligate DVRC to pay a material percentage of its revenue to ReathCo. Under the agreements governing its funds, DVRC is entitled to a profit interest equal to 75% of the profits that the funds generate. The funds invested 100% of their AUM in loans that paid interest of 2% per year, so DVRC's maximum profit interest would equal 1.5% of AUM. DVRC also was entitled to a management fee from the funds equal to 0.25% of AUM. Together, DVRC's maximum revenue was 1.75% of AUM. The DVRC Management Agreement would have committed DVRC to pay 1/7 of that amount, or approximately 14%, to Manheim.[9]

In terms of the allocation of the cash flows of the business, the existence of the DVRC Management Agreement was a material fact. Manheim, Ban, and Bamford were seeking to allocate the returns from the EB-5 Business in a fair and transparent manner. In the context of those discussions, Manheim had an obligation to raise the DVRC Management Agreement if it remained in effect.

In the Factual Findings, the court made the following finding:

Bamford and Ban executed the agreements knowingly and voluntarily. The evidence does not support a finding of any misrepresentations by Manheim

---

[9] The actual percentage that Manheim received would be higher, because the funds must bear their expenses, and the profit interests is net of expenses. Including expenses reduces the denominator (the 1.75%) and increases the percentage represented by the numerator (the 0.25%). The calculation above the line thus understates the significance of the DVRC Management Agreement.

in connection with the restructuring of DVRC, the DVRC Admission Agreement, or the Contribution Agreement.

FF ¶ 51. It is only possible to make that finding if the DVRC Management Agreement terminated in June 2015 such that it was no longer in effect and Manheim had no obligation to raise it.

## M.    A Time Of Coexistence

After the Reorganization, Manheim, Ban, and Bamford co-existed for a time. Money began to flow. Ban handled the day-to-day operations. Manheim provided big-picture oversight and maintained relationships with key stakeholders.

Bamford was optimistic about the prospects for the EB-5 Business. He expected DVRC to make distributions, and he anticipated using them to make investments with Manheim. *See* Bamford Tr. 35.

During 2016, Manheim's brother, Frank, relocated to Philadelphia with his family. Frank Tr. 756. Frank had worked in investment banking for twelve years and was looking to do something entrepreneurial. *See* Manheim Tr. 566; Frank Tr. 755, 757. Frank joined ReathCo, where he spent the bulk of his time analyzing potential investments for Bamford. Frank Tr. 756–57.

In December 2016, Bamford moved to the United States. DVRC provided him with an apartment in Philadelphia. JX 331. He participated in meetings of the WestCo Board, engaged in efforts to market DVRC to investors, and traveled to China with Manheim. *See, e.g.*, JX 330; JX 338; JX 441.

## N.    The SEC Inquiry

In February 2017, the Securities and Exchange Commission ("SEC") sent a letter of inquiry to DVRC asking for twenty-three categories of documents. JX 385. That spelled trouble. Manheim and Ban had spent years operating in start-up mode, had not adhered to corporate formalities, and had not kept diligent records. They needed help getting their house in order. Manheim also did not want any negative repercussions with the PTC or SEPTA.

Manheim reached out to Mezzaroba for help. Manheim Tr. 564–65; Mezzaroba Tr. 780. Mezzaroba was an experienced lawyer and a known quantity. He was a longtime friend of Manheim, and he was one of the first people with whom Manheim discussed the EB-5 Program. He had been involved with DVRC from time to time, and he had helped arrange for DVRC to receive the $500,000 loan in 2013 from the Delaware Valley Regional Economic Development Fund, where he served as a trustee. *See* Mezzaroba Dep. 80–85, 107; PTO ¶ 72. Mezzaroba also had connections at the PTC and SEPTA that gave him credibility with those institutions. Manheim Tr. 564–65.

On March 15, 2017, the WestCo Board met. Manheim and Bamford attended in person. Ban attended by phone. During the meeting, the Board resolved to hire Mezzaroba as general counsel. JX 399.

When he agreed to help, Mezzaroba viewed Manheim and Ban as "the two dogs that caught the fire truck." Mezzaroba Tr. 781. He thought the rapid expansion of the

34

business had gotten away from them, and he needed to help them catch up. But after digging into DVRC's documentation, he realized that he had a mess on his hands:

> So as we were putting together documents to respond to the SEC, we found that there was no rhyme or reason to the files. Each individual investor at that point had [invested $500,000 for a total of] $200 million, which means there were 400 investors. They didn't have individual files. There was no way to really track them. They had immigration files that had to be attached, as well as there was -- the books and records were a mess.

> So pretty much in the very beginning, I realized it was going to be a lot of work. And on top of that, we had the time clock of the SEC beating down on us.

*Id.* at 782.

Mezzaroba recommended hiring Frank to assist in responding to the SEC. Manheim Tr. 566. Frank was another known quantity, and he had experience conducting FINRA investigations from his days in investment banking. *Id.*; Frank Tr. 755, 763. He had the skills to do the heavy lifting necessary to prepare and assemble documentation for the SEC. *See* Frank Tr. 755–56, 766–67.

On May 22, 2017, the WestCo Board held an in-person meeting to address a list of items that were part of the effort to clean up the affairs of WestCo and DVRC. Manheim and Bamford attended. JX 465. The actions they took included appointing Frank and Mezzaroba as vice presidents of WestCo, each with a salary of $150,000 annually. JX 466.

## O. The June 2017 Board Meeting

As part of the process of responding to the SEC, DVRC "had to go through a review and kind of figure out what were the agreements that were outstanding that had potential

35

disclosure, should be disclosed at this stage, or would be disclosable kind of thing."
Manheim Tr. 569. The Management Agreements surfaced during that process.

The rediscovery of the Management Agreements raised the question of whether to simplify DVRC's financial statements by (i) having DVRC pay a management fee to an entity and (ii) shifting all of DVRC's payroll and other expenses to that entity (the "Management Company Structure"). Mezzaroba liked the Management Company Structure. He believed that it would be easier to present DVRC's financial statements to regulators like the SEC and the USCIS. Mezzaroba Tr. 784–86; *see* Manheim Tr. 570.

As the court has found, Manheim had terminated both Management Agreements on June 30, 2015. There was, however, no formal documentation of that event. Manheim, Ban, and Bamford had created and backdated other documents, such as the DVRC LLC Agreement and the Admission Agreement. If everyone had been on board with saying that the Management Agreements had never actually been terminated, then it would be easy to act as if that were true.

No one saw any need to reactivate the relationship between WestCo and ReathCo. Manheim had anticipated that once DVRC was generating income, the WestCo Management Agreement would become superfluous. *See* Manheim Tr. 515. DVRC had reached that point.

The real question was whether to use the ReathCo Management Agreement as the basis for implementing the Management Company Structure, or whether to establish a new entity and create a new agreement. Conversations about what to do started in March 2017

and went on as the SEC process unfolded. *See id.* at 570 ("[T]hat conversation started in March after we started going through the review folders and started looking at everything."); Mezzaroba Tr. 784–85 (testifying that there were discussions "after or in the middle of this SEC [inquiry]" about "whether it was cleaner to move all of management off of DVRC's payroll").

The WestCo Board considered the issue during an in-person meeting on June 7, 2017 (the "June 2017 Meeting"). The items of business for the meeting included (i) expanding the WestCo Board and filling the newly created vacancies with Frank and Mezzaroba, (ii) "Review and discuss current 17-week cash flow budget," and (iii) "Discussion of role of Reath & Company as manager of DVRC." JX 479 at 1. The 17-week cash flow budget contemplated payments to ReathCo. Before the June 2017 Meeting, DVRC had not made payments to ReathCo. Manheim Tr. 569–70.

The minutes for the June 2017 Meeting are skeletal. They state only that "[d]uring today's meeting the Board tabled and approved the following motions," followed by a list of eight items. JX 480. The list includes "[a]ppointment of [Frank] and [Mezzaroba] as Board members" and "[a]ccept form & function of the 17-week cashflow." *Id.* The 17-week cashflow budget showed a series of weekly payments to ReathCo that varied in amount. JX 1740.

On the ReathCo issue, the minutes state:

Move all executives off of DVRC payroll to Reath & Company or new entity and payroll is created for Chloe Deon and Kareem Rosser. Compensation will be transferred for [Frank] and [Mezzaroba]. Further, Board will evaluate

37

> Reath & Company vs. new entity as appropriate vehicle for executives and executive operations going forward.

JX 480. This is a reference to the Management Company Structure.

The minutes state that the WestCo Board approved moving "all executives . . . and payroll" to "Reath & Company or new entity." *Id.* In other words, the WestCo Board generally approved moving to the Management Company Structure. The minutes do not reflect a decision between ReathCo or a new entity. Instead, the minutes reflect that the Board determined to "evaluate" using ReathCo or a new entity. The minutes do not reflect any consideration of a management fee beyond the approval of the 17-week cashflow budget, which provided for payments to ReathCo. *See* JX 1740.

A particularly sharp dispute of fact exists as to what action, if any, the WestCo Board took during the June 2017 Meeting about DVRC paying a management fee to ReathCo. After the June 2017 Meeting, substantial sums of money began flowing from DVRC to ReathCo. In this litigation, Ban and Bamford challenged those transfers. Manheim responded by relying on the DVRC Management Agreement to validate the transfers. *See* JX 1104 at 10–11 (Interrog. 10); JX 1141 at 4–5 (same); Dkt. 320 at 8, 25–26; PTO ¶¶ 8, 16.

The June 2017 Meeting was the only time that the WestCo Board considered the relationship between DVRC and ReathCo. *See* Frank Tr. 761–62. The witnesses agree for the most part about what took place. Frank, Mezzaroba, and Manheim testified that the discussion focused on whether ReathCo should take on the responsibility of handling DVRC's payroll and expenses. Manheim Tr. 569–70; Frank Tr. 761–62; Mezzaroba Tr.

38

784–86. Mezzaroba recalled that Ban vehemently opposed using ReathCo as the management company, which led to a "blowup" with Manheim. Mezzaroba Tr. 785. Frank agreed that Ban expressed "concern around the expansion of the [ReathCo] role." Frank. Tr. 762.

Ban similarly recalled that the proposal was to shift the payroll and expenses out of DVRC and to place them in ReathCo or a different entity. Ban testified that he did not object to the idea of moving the payroll and other expenses to a management company, but that he was adamantly opposed to the entity being ReathCo. Ban Tr. 227–28. He insisted on a new entity, and he recalled a "big spat" about that issue. *Id.* at 412. Ban testified that no agreement was reached during the June 2017 Meeting, and that Manheim said that he would look into the possibility of creating a new entity. *Id*. at 228.

The witnesses generally agree that the WestCo Board did not engage in a meaningful discussion about the DVRC Management Agreement. Manheim, Mezzaroba, and Frank maintained that everyone understood that the DVRC Management Agreement remained in place. *See* Manheim Tr. 569–70; Frank Tr. 761–62; Mezzaroba Tr. 785–86. Frank testified that the existence of the DVRC Management Agreement was "taken as given." Frank Tr. 762. The agreement was not circulated in advance of the meeting. *See* JX 478; Mezzaroba Tr. 806. Only Mezzaroba testified that printed copies of the agreement were available during the meeting, and his testimony to that effect at trial went beyond his deposition, where he only recalled a discussion of the agreement. *Compare* Mezzaroba Tr. 786, *with* Mezzaroba Dep. 86–87.

39

Ban did not recall any discussion of the DVRC Management Agreement, and he insisted that there also was no understanding that the agreement remained in place. Ban Tr. 299, 383–85. On cross-examination, Ban maintained resolutely that Manheim wanted to have either ReathCo or the new entity receive a management fee, but that Manheim was proposing a new arrangement, not the activation of an existing arrangement. *See id.* at 389, 412. Ban said he was "adamantly against" a management fee going to ReathCo. *Id.* at 389. Bamford did not recall any discussion of the DVRC Management Agreement during the June 2017 Meeting. Bamford Dep. 532–33. Bamford testified that "there wasn't any discussion [during the June 2017 Meeting] about [ReathCo] being paid a management fee." Bamford Dep. 462.

The trial testimony supports a finding that the WestCo Board did not approve a management fee for ReathCo during the June 2017 Meeting. The limited contemporaneous documentation points to the same conclusion. There was no formal resolution approving a management fee or referencing the DVRC Management Agreement. By contrast, when considering other significant matters during 2017, the WestCo Board approved formal resolutions. *See* JXs 563–64; JX 581; JX 612; *see also* JX 603; JX 624.

Three weeks after the meeting, Ban asked about the plan to shift the payroll to a new entity or ReathCo. Manheim responded:

> The new entity is ongoing as discussed, but that is irrelevant really to the question of this as regardless what entity it is the policy as we have been discussing it will continue. The policy is namely the movement up and out of DVRC all executives and related compensation and the implementation of a management fee & expenses going forward from DVRC to Reath & Company whether it is vs 1.0 or vs 2.0. . . . As far as how the structure is

40

concerned – regardless of vs 1.0 or vs 2.0 – it will be a multi-member llc with profits interests in the same vein as a private equity management entity (a la' KKR). As the AUM grows the management fees will grow and this flow will be taxable income which we will use to grow the overall businesses.

JX 497 (formatting altered). Manheim's email acknowledged the contemplation of a "new entity." He acknowledged that the version of the fee ("1.0 vs. 2.0") was still under discussion. And he asserted that regardless of whether ReathCo or a new entity served in the management company role, it would be a "multi-member llc with profits interests in the same vein as a private equity management entity." *Id.* ReathCo was not a multi-member LLC, and the DVRC Management Agreement did not give ReathCo a profit interest. It gave ReathCo a fee calculated as a percentage of AUM.

During post-trial briefing, the defendants contended that the court already determined in its Factual Findings that the WestCo Board approved paying a management fee to ReathCo during the June 2017 Meeting. They rely on the following language:

> In response to Ban's concerns and as a condition of the 2015 EastCo Loan, Manheim terminated the WestCo Management Agreement. Manheim's email did not expressly address the DVRC Management Agreement, but a preponderance of the evidence demonstrates that it was terminated as well. When the board of directors of WestCo approved a management fee to ReathCo in June 2017, that was a new agreement with ReathCo, not a continuation of the DVRC Management Agreement.

FF ¶ 21 (cleaned up). That finding was directed primarily at the termination of the DVRC Management Agreement. That finding was not intended as a determination that the WestCo Board approved a management fee to ReathCo in June 2017. In hindsight, the court should have drafted the factual finding to read, "To the extent the board of directors of WestCo approved a management fee to ReathCo in June 2017, that was a new agreement with

41

ReathCo, not a continuation of the DVRC Management Agreement." The intent was to make clear that to the extent that occurred, then the arrangement was a new one, not a continuation of the DVRC Management Agreement. The Factual Findings did not attempt to determine what took place at the June 2017 Meeting with any degree of specificity.

Having considered the evidence and weighed the parties' testimony, I do not believe that the WestCo Board focused meaningfully on the DVRC Management Agreement during the June 2017 Meeting. The WestCo Board discussed whether to move to the Management Company Structure. When introducing the concept, Manheim may have referred to the DVRC Management Agreement and the fact that Manheim and Ban had contemplated something similar, but that was it. There was no board-level determination that going forward, DVRC would comply with the DVRC Management Agreement. There was a consensus that DVRC would move towards the Management Company Structure, but no consensus as to the entity or the details. Ban strongly opposed using ReathCo as the management company, but he was not against the Management Company Structure as a concept.

## P. The Transfers After The June 2017 Meeting

After the June 2017 Meeting, money started flowing from DVRC to ReathCo. Manheim Tr. 570. The transfers do not appear to match up with the 17-week cash flow budget. They also do not self-evidently match up with the terms of the DVRC Management Agreement. That agreement called for ReathCo to receive an annual management fee equal to 0.25% of AUM, paid in monthly installments on the first of the month. It should have

resulted in ReathCo receiving a designated amount on the first of the month.[10] Instead, wires went out to ReathCo at varying times and in varying amounts.[11] Rather than paying an AUM-based management fee to ReathCo, it looks like ReathCo was receiving funds to cover Manheim's salary and benefits, plus reimbursement of expenses, plus variable and inconsistent additional amounts to which Ban objected. *See, e.g.*, JX 486; JX 495; JX 506; *see also* JX 674 (Manheim noting that "a bunch of the transfers to Reath and West [during 2017] were reimbursement for expenses").

Frank or another DVRC employee generally initiated the transfers, but Ban knew about them. Ban Tr. 391–92. Ban did not object to every transfer. He had made his objections to the management fee known during the June 2017 Meeting, and he questioned the transfers that took place during the month after the June 2017 Meeting. He recognized

---

[10] For example, assume that DVRC had approximately $414 million in AUM in 2017, consisting of the assets in PTC I, PTC II, and SEPTA II. *See* JX 1060 at 10. The DVRC Management Agreement would have resulted in ReathCo receiving an annual management fee of $1,035,000, payable in monthly installments of $86,250, with each installment due on the first of the month.

[11] *See, e.g.*, JX 494 at '003 (June 27, 2017 email from Manheim to Ban identifying wire transfer of $85,000 to ReathCo for management fee and expenses); JX 506 (June 28, 2017 email from Ban to Manheim, Frank, and Mezzaroba listing transfers to ReathCo); JX 520 (July 24, 2017 email from Frank to Ban stating, "We are moving money today to cover end of July and August expenses at [ReathCo]"); JX 532 (August 9, 2017 email from Frank to Ban stating, "To pay for outstanding payables at [ReathCo] for IT and the Union League, we have transferred $45,000 from the DVRC account"); JX 700 (April 30, 2018 email instructing bank to wire $128,915.63 from DVRC to ReathCo and copying Ban); JX 2052 (Frank emailing Ban about the details of various transfers that DVRC planned to make, including a transfer of $221,065.55 from DVRC to ReathCo).

that some transfers were proper, such as for reimbursement of expenses. He believed there would be an overall true up at some point once the terms of the management agreement were established. *See id.* at 390, 394; JX 506 ("I assumed . . . that there would be true up at some point soon where money would be coming back to DVRC").

## Q. The Recharacterization Of The Transfers As Management Fees

The transfers to ReathCo became management fees when DVRC prepared its audited financial statements for 2017. During that effort, a DVRC employee named Derek Chen calculated the amount of the monthly management fee that would have been due to ReathCo under the DVRC Management Agreement, then added those amounts as liabilities on DVRC's financial statements. For monthly amounts that were past due, he calculated and included the amount of interest due. Chen Tr. 744–45.

To determine how much of the management fee had been paid to ReathCo, Chen and a colleague reviewed all of the transfers from DVRC's bank account to ReathCo. *Id.* at 746. They designated all of the transfers as "management fees." *Id.* at 746–50. There was no investigation into whether the transfers actually were management fees.

Based on these calculations, DVRC's audited financial statements for the year ending December 31, 2017, disclosed that DVRC had incurred $945,434 for management fees in 2017. Those fees were in addition to $940,031 for officer compensation and $235,547 for salaries and wages during that same year. JX 1060 at '005. The notes to the financial statements stated:

> The Company has a management service agreement with Reath & Co. which is wholly-owned by one of the Company's directors . . . . For the year ending

December 31, 2017, the Company incurred $945,434 of management fees and $81,240 of interest, of which $670,754 is due to Reath & Co. at December 31, 2017, and is included in due to related party on the balance sheet.

*Id.* at '011. The notes also disclosed that ReathCo "has paid for certain operating costs for the Company with no formal repayment terms" and that the balance owed to ReathCo as of December 31, 2017, was $338,760. *Id.*

## R.     Bamford Checks Out, Then Becomes Suspicious.

In late 2017, Bamford struggled with health problems. Bamford Tr. 173. Bamford also found himself strapped for cash following disagreements with his father. *See id.* at 156–57, 161. He became frustrated that DVRC was not generating the magnitude of distributions that he expected, and he questioned the level of expenses that DVRC was incurring. *See id.* at 162. But rather than fight with Manheim over these issues, he "decided not to get involved and clip a coupon," by which he meant to accept the distributions he received. JX 719 at '007.

In early 2018, Bamford returned to the United Kingdom. *See* Bamford Tr. 48, 109, 157. He delegated the task of supervising his investments to his advisors. But then a series of incidents caused him to grow concerned about how Manheim was operating DVRC.

From conversations with Manheim, Bamford understood that DVRC would make distributions twice a year, once in January and a second time in June. In January 2018, Bamford received a distribution of $1 million. Bamford asked Manheim about his expectations for June, and Manheim indicated that the distribution would be around the same amount. In April 2018, Manheim told Bamford the same thing. Six weeks later,

Manheim told Bamford there were problems with the business and that DVRC would not be making a distribution in June. *Id.* at 39–40.

The sudden change of fortune did not make sense to Bamford, so he reached out to Ban. *Id.* at 41. Bamford did not have a personal relationship with Ban. To the contrary, Bamford had always trusted Manheim and been skeptical of Ban. *See* JXs 566–69; JX 571; JX 811; Bamford Tr. 78–80. Now, however, Bamford had become suspicious of Manheim, and he wanted to understand what was happening with DVRC. Bamford Tr. 41.

In a series of LinkedIn messages, Ban told Bamford that Manheim wanted Ban to leave DVRC. *See* JX 719. He also said that Manheim was taking lots of money out of the business. Bamford was surprised and wanted to learn more. Bamford also expressed his personal frustration with Manheim "running his life through the business." *Id.* at '003. They soon began discussing whether they could take control of DVRC. *Id.* at '009–10. They decided that Ban would contact a lawyer for advice. *Id.* at '016–17; *see* Ban Tr. 253.

In reality, Ban had been suspended from DVRC. During Frank's efforts to organize DVRC's records, he migrated DVRC's electronic documents to a new system. As part of that process, on May 14, 2018, Frank came across email exchanges between Ban and one of DVRC's representatives in China. The emails discussed threats that certain investors in DVRC's funds would file lawsuits if their investments were not redeemed after they received their green cards. JX 826 at '002, '006–07; Frank Tr. 763–64. In the e-mail chain, Ban proposed potential ways to resolve the lawsuits. *See* JX 826 at '003–14. Ban had not discussed the threatened lawsuits with anyone else at DVRC.

46

Frank brought the situation to Manheim. Ban and Manheim had endured a contentious relationship for years, and Ban and Frank had never gotten along. For Manheim, the discovery of the email exchanges was the final straw, because the emails raised concerns about compliance with the law and whether DVRC's disclosures to the SEC were correct. Manheim Tr. 572–73. Manheim immediately placed Ban on suspension pending the outcome of an investigation. *Id.* at 581–82; JX 709.

## S. The Two Factions

After being suspended and connecting with Bamford, Ban began assembling the documents he possessed and considering ways that he and Bamford could take control of DVRC. *See* JX 722. He also began contacting lawyers about potential lawsuits. *See, e.g.*, JX 725; JX 795; JX 1905. At the same time, Bamford and his advisors began asking for information from DVRC. They asked about the change in the projected level of distributions. They also asked for accounting records for DVRC. *See, e.g.*, JX 791; JX 797; JXs 803–04; JXs 806–07; JX 1906. Like Ban, Bamford contacted a lawyer about potential litigation. *See* JX 788.

Ban traveled to London to meet with Bamford in person. Through their access to Ban's work computer, Manheim, Frank, and Mezzaroba discovered that Ban was meeting with Bamford. They concluded that Ban and Bamford were conspiring against them. *See* Manheim Tr. 585–86, 592.

## T.     The June 2018 Meeting

In one of his requests for information, Bamford asked when the next meeting of the WestCo Board would be. *See* JX 824. On June 25, 2018, Frank sent Bamford a notice of a meeting on June 28. JX 826. As the sole item of business, it identified "[t]he removal of Young Min Ban as an officer of [WestCo] and DVRC and as a (nominal) director of DVRC, for the reasons set forth in the annexed Statement of [WestCo's] President and Chief Executive Officer." *Id* at '001. The agenda did not list any of the issues that Bamford had been asking about. Bamford Tr. 43.

In his statement to the WestCo Board, Manheim reported that Ban had sent letters to investors that violated USCIS regulations. He also reported that Ban had entered into a finder's fee agreement with an agent that was prohibited by securities laws. JX 826 at '002–03.

On June 27, 2018, Bamford asked for more information about Ban's proposed termination. He also stated that he would be sending a formal demand for books and records. JX 840.

The WestCo Board convened on June 28, 2018. Bamford attended by phone and recorded the meeting, so there is a transcript of what occurred. JX 1923. Manheim had caused ReathCo to hire special counsel who led the meeting. *Id.* at 1–3. The discussions quickly became contentious. When the WestCo Board voted to terminate Ban, Bamford abstained. *Id.* at 33.

During the meeting, Bamford sought to have Manheim confirm that the officers' agreed-upon salaries were $300,000 per year. *Id.* at 50–58. Manheim was evasive, but generally indicated that the officers were receiving $300,000 per year plus benefits. *Id.*

After Ban's termination, Frank took over Ban's responsibilities. He later took on the title of Chief Operating Officer.

## U. Manheim Removes Bamford From The WestCo Board.

Immediately after the June 2018 meeting, Bamford instructed his assistant to "start a litigation file." JX 853; *see, e.g.*, JXs 855–57. On July 9, 2018, Bamford sent a books and records demand to Manheim that asked for thirty-six categories of documents. JX 880. On August 9, 2018, two of Bamford's agents performed an on-site records inspection at DVRC's office. JX 932.

Manheim, Frank, and Mezzaroba viewed Bamford as allied with Ban and a threat to DVRC. *See* Manheim Tr. 578. The day after Bamford's agents conducted their inspection, Manheim caused DVRC to transfer funds to WestCo so that WestCo could repay the loans from EastCo. *See* Mezzaroba Tr. 810–12. A loan agreement dated August 10, 2018, documented a loan in the amount of $1,798,332.17, bearing interest at 6.5% annually, with a single balloon payment due on December 31, 2023. PTO ¶ 76.

On August 13, 2018, Manheim informed Bamford that he had caused WestCo to repay the loans from EastCo. JX 941. Manheim told Bamford that his role as a director derived from the existence of the loans. With WestCo having repaid them, Manheim

removed Bamford from the WestCo Board. *Id.* Manheim took that action by written consent in his capacity as the majority stockholder of WestCo. *Id*.

## V. Manheim Adds Mandle To The Board.

Having removed Ban and Bamford from the WestCo Board, Manheim filled one of the resulting vacancies with Mandle on September 28, 2018. JX 998. Mandle was given the role of Chief Compliance Officer with a salary of $150,000. *Id*. In November 2018, Mandle was made a vice president. JX 1048.

In addition to her salary, Mandle received a bonus of $75,000 in 2020. *See* JX 1309; Mandle Tr. 735; Mezzaroba Tr. 802. She receives a travel stipend of up to $18,000 per year. Mandle Tr. 736–38.

On November 11, 2018, the Board increased Frank's and Mezzaroba's salaries from $150,000 to $300,000 per year. JX 1018. Frank and Mezzaroba recused themselves from the vote. Manheim and Mandle approved the increase. *Id*.

## W. This Litigation

On November 30, 2018, Bamford filed a lawsuit in this court in which he asserted derivative claims on behalf of Penfold and DVRC against Manheim, ReathCo, and WestCo. *See Bamford v. Penfold L.P.*, C.A. No. 2018-0867-JTL (Del. Ch.). Bamford dismissed the complaint voluntarily and without prejudice in December 2018.

On January 4, 2019, Bamford filed this action. He again asserted derivative claims on behalf of Penfold and DVRC against Manheim, ReathCo, and WestCo.

In April 2019, Ban intervened. Bamford and Ban then filed a consolidated complaint. After additional pleading-stage maneuvering, Bamford and Ban settled on an operative complaint. Dkt. 73 (the "Complaint"). The Complaint contained thirteen counts:

- In Count I, the plaintiffs asserted a derivative claim on behalf of Penfold for breach of fiduciary duty against Manheim and ReathCo as general partners. *Id.* ¶¶ 126–31.

- In Count II, the plaintiffs asserted a derivative claim on behalf of DVRC for breach of fiduciary duty against Manheim and WestCo. *Id.* ¶¶ 132–37.

- In Count III, the plaintiffs asserted a derivative claim on behalf of Penfold for fraud against Manheim and ReathCo. *Id.* ¶¶ 138–43.

- In Count IV, the plaintiffs asserted a derivative claim on behalf of Penfold for breach of contract against Manheim and ReathCo. *Id.* ¶¶ 144–47.

- In Count V, the plaintiffs asserted a derivative claim on behalf of DVRC for fraud against Manheim, WestCo, and ReathCo. *Id.* ¶¶ 148–57.

- In Count VI, the plaintiffs asserted personal claims for conversion against Manheim. *Id.* ¶¶ 158–61.

- In Count VII, Bamford asserted a personal claim for breach of fiduciary duty against Manheim. *Id.* ¶¶ 162–68.

- In Count VIII, Bamford asserted a personal claim for common law fraud against Manheim. *Id.* ¶¶ 169–76.

- In Count IX, Ban asserted a personal claim for common law fraud against Manheim. *Id.* ¶¶ 177–86.

- In Count X, the plaintiffs asserted direct claims on their own behalf and a derivative claim on Penfold's behalf for unjust enrichment against Manheim. *Id.* ¶¶ 187–92.

- In Count XI, Bamford asserted a personal claim for negligent misrepresentation against Manheim. *Id.* ¶¶ 193–200.

- In Count XII, Ban asserted a personal claim for negligent misrepresentation against Manheim. *Id.* ¶¶ 201–09.

51

- In Count XIII, the plaintiffs sought a declaration that Penfold's limited partnership agreement is void. *Id.* ¶¶ 210–20.

The defendants answered Counts I and XIII and moved to dismiss the other counts. *See* Dkt. 76.

The court issued an opinion on the motion to dismiss. *See Bamford v. Penfold, L.P.* (*Dismissal Decision*), 2020 WL 967942, at *1 (Del. Ch. Feb. 28, 2020). The court dismissed Counts III, V, and X in their entirety. *Id.* at *33. The court dismissed Count XII with respect to Ban's claim for negligent misrepresentation based on his compensation. *Id.*

The plaintiffs then amended the Complaint to add a claim against ReathCo for aiding and abetting Manheim's breaches of fiduciary duty. Dkt. 217 ¶¶ 221–25. Manheim, ReathCo, and DVRC answered and asserted three counterclaims against Ban for violations of the federal Computer Fraud and Abuse Act, the Pennsylvania Uniform Trade Secrets Act, and conversion. Dkt. 225.

A four-day trial was held in June 2021. At the end of trial, the court found that there was no general fiduciary relationship between Manheim and Bamford and therefore ruled in Manheim's favor on Count VII. Separately, the court found that Ban's loans were retroactive recharacterizations of his 2015 and 2016 compensation and entered judgment in Ban's favor on DVRC's counterclaim against him to recover the loans.

On July 21, 2021, the court issued the Factual Findings, which had the effect of resolving several other claims. First, the court found that Ban never hacked into a DropBox account belonging to DVRC or anyone associated with DVRC. FF ¶¶ 62–64. That finding resulted in Ban prevailing on the remaining counterclaims against him.

Next, the court found that Penfold does not have a written partnership agreement. *Id.* ¶ 59. That finding resulted in the defendants prevailing on Count IV and Count XIII.

Finally, as noted, the court determined that the trial evidence did not support "a finding of any misrepresentations by Manheim" in connection with the Reorganization or the execution of the Admission Agreement and the Contribution Agreement. *Id.* ¶ 51. That finding resolved the plaintiffs' claims of fraud (Counts VI, VIII, and IX) and negligent misrepresentation (Counts XI and XIII).

## II. LEGAL ANALYSIS

What remains for decision are derivative claims against Manheim, ReathCo, and WestCo for causing DVRC to make transfers that were unfair to DVRC and its non-controlling investors. The plaintiffs challenge transfers that went to Manheim and ReathCo. The plaintiffs also challenge transfers that DVRC made to Frank, Mezzaroba, and Mandle. The transfers consist of compensation, benefits like car and travel allowances, and reimbursement of expenses.

As framed in the Complaint, the remaining claims fall under three counts.

- In Count I, the plaintiffs asserted a derivative claim on behalf of Penfold against Manheim and ReathCo for breach of fiduciary duty as general partners of Penfold.

- In Count II, the plaintiffs asserted a double-derivative claim on behalf of DVRC against Manheim and WestCo for breach of fiduciary duty as officers and controlling members of DVRC.

- In Count XIV, the plaintiffs asserted a claim against ReathCo for aiding and abetting Manheim's and WestCo's breaches of fiduciary duties.

Those formulations are legally precise, but analytically cumbersome.

53

The court is not bound to analyze the case solely through the counts presented in the pleadings. The notion that a complaint must plead the specific legal theories on which the plaintiff can proceed is a throwback to the "theory of the pleadings." *See* 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1219 (4th ed.), Westlaw (database updated Apr. 2022). Under that doctrine, which was a feature of pleading at common law and of code pleading in some jurisdictions, a complaint had to "proceed upon some definite theory, and on that theory the plaintiff must succeed, or not succeed at all." *Mescall v. Tully*, 91 Ind. 96, 99 (1883). Put differently, a plaintiff had to pick a legal theory at the outset of the case and stick with it to the end. *See* Fleming James, Jr., *The Objective and Function of the Complaint: Common Law—Codes—Federal Rules*, 14 Vand. L. Rev. 899, 910–11 (1961). If the facts did not support the theory that the plaintiff had picked, then the court would not grant relief, even if the plaintiff was entitled to relief until a different theory. *See id.*

Through a combination of rules, the Federal Rules of Civil Procedure "effectively abolished the restrictive theory of the pleadings doctrine, making it clear that it is unnecessary to set out a legal theory for the plaintiff's claim for relief." 5 Wright & Miller, *supra*, § 1219 (footnote omitted).

> Federal Rule of Civil Procedure 8(a) eliminates the concept of "cause of action"; Rule 8(d) provides that a party may set forth two or more statements of claim alternatively or hypothetically; Federal Rule of Civil Procedure 15(b) deals a heavy blow to the doctrine by permitting amendments as late as the trial and treating issues as if they had been raised in the pleadings when they are tried by the express or implied consent of the parties; and Federal Rule of Civil Procedure 54(c) provides that, except in the case of a default

judgment, the "final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings."

*Id.* (footnotes omitted). Under the Federal Rules of Civil Procedure, "particular legal theories of counsel yield to the court's duty to grant the relief to which the prevailing party is entitled, whether demanded or not." *Gins v. Mauser Plumbing Supply Co.*, 148 F.2d 974, 976 (2d Cir. 1945) (Clark, J.). "The federal rules—and the decisions construing them— evince a belief that when a party has a valid claim, he should recover on it regardless of his counsel's failure to perceive the true basis of the claim at the pleading stage, provided always that a late shift in the thrust of the case will not prejudice the other party in maintaining a defense upon the merits." 5 Wright & Miller, *supra*, § 1219 (footnotes omitted); *see Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) (per curiam) (reversing dismissal of complaint for failure to articulate a claim under 42 U.S.C. § 1983; explaining that the Federal Rules of Civil Procedure rejected the "theory of the pleadings" and "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted").

> Court of Chancery Rule 15(b) is designed to address this type of situation. It states:
>
> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues.

Ct. Ch. R. 15(b). The federal counterpart to this rule was part of the drafters' effort to leave behind the earlier system in which "the pleadings completely controlled the subsequent

phases of the litigation," under which "[e]vidence offered at trial that was at variance with allegations in the pleadings could not be admitted, or, if admitted, would not be allowed to provide the basis for the final disposition of the action." 6A Wright & Miller, *supra*, § 1491. By adopting Rule 15(b), the drafters sought "to promote the objective of deciding cases on their merits rather than in terms of the relative pleading skills of counsel or on the basis of a statement of the claim or defense that was made at a preliminary point in the action." *Id.* (footnote omitted).

The disputes in this case boil down to whether Manheim breached his fiduciary duties. Delaware law imposes fiduciary duties on those who control an entity.[12] Manheim controlled DVRC through his control over WestCo. He also controlled ReathCo. As the individual who controlled DVRC, Manheim owed fiduciary duties that obligated him to act in the best interests of DVRC and its residual claimants, including Penfold.[13] To the

---

[12] *In re Pattern Energy Gp. Inc. S'holders Litig.*, 2021 WL 1812674, at *36 (Del. Ch. May 6, 2021); *Voigt v. Metcalf*, 2020 WL 614999, at *11 (Del. Ch. Feb. 10, 2020); *Quadrant Structured Prods. Co. Ltd. v. Vertin*, 102 A.3d 155, 183–84 (Del. Ch. 2014).

[13] *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 670–71 (Del. Ch. 2012); *see In re USACafes, L.P. Litig.*, 600 A.2d 43, 48 (Del. Ch. 1991); *see also Paige Cap. Mgmt. LLC v. Lerner Master Fund, LLC*, 2011 WL 3505355, at *30 (Del. Ch. Aug. 8, 2011) (applying *USACafes* to impose fiduciary liability on individual who was the managing member of the LLC that acted as general partner for limited partnership); *Gelfman v. Weedon Invs., L.P.*, 792 A.2d 977, 992 n.24 (Del. Ch. 2001) (applying *USACafes* to directors and officers of corporate general partner); *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 795 A.2d 1, 34 (Del. Ch. 2001) (applying *USACafes* to individuals and entities who controlled corporate general partner), *aff'd in part*, 817 A.2d 160 (Del. 2002); *Bigelow/Diversified Secondary P'ship Fund 1990 v. Damson/Birtcher P'rs*, 2001 WL 1641239, at *8 (Del. Ch. Dec. 4, 2001) (explaining that "affiliates of a general partner who exercise control over the

56

extent Manheim breached his fiduciary duties by engaging in disloyal conduct, he can be held liable.

It does not matter that Manheim may have acted through an agent or instrumentality like ReathCo or WestCo.[14] Manheim owed fiduciary duties as the ultimate controller of DVRC and remains subject to liability in that capacity.

The additional involvement of an entity as the agent or instrumentality means only that the entity can be held jointly and severally liable with Manheim.[15] There are two routes

---

partnership's property may find themselves owing fiduciary duties to both the partnership and its limited partners"); *Wallace ex rel. Cencom Cable Income P'rs II, L.P. v. Wood*, 752 A.2d 1175, 1180 (Del. Ch. 1999) (applying *USACafes* and stating that "unquestionably, the general partner of a limited partnership owes direct fiduciary duties to the partnership and to its limited partners").

[14] *In re EZCORP Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245, at *8–10 (Del. Ch. Jan. 25, 2016) (holding that fiduciary duties extended to individual defendant who was the "ultimate controller" of the entity even though the defendant exercised control indirectly and did not himself own stock); *see S. Pac. Co. v. Bogert*, 250 U.S. 483, 492 (1919) ("[T]he doctrine by which the holders of a majority of the stock of a corporation who dominate its affairs are held to act as trustee for the minority does not rest upon such technical distinctions. It is the fact of control of the common property held and exercised, not the particular means by which or manner in which the control is exercised, that creates the fiduciary obligation."); *Eshleman v. Keenan*, 187 A. 25, 28–29 (Del. Ch. 1936) (imposing personal liability on individual owners of a corporation that received a management fee from another entity that they controlled), *aff'd*, 2 A.2d 904, 908 (Del. 1938) ("The conception of corporate entity is not a thing so opaque that it cannot be seen through; and, viewing the transaction as one between corporations, casual scrutiny reveals that the appellants, in fact, dealt with themselves to their own advantage and enrichment. The employment of Consolidated by Sanitary was merely the employment by the appellants of themselves to do what it was their plain duty to do as officers of Sanitary.").

[15] *EZCORP*, 2016 WL 301245, at *10 (holding that complaint stated a claim against both Cohen, the ultimate controller, and the entity through which he exercised control);

for the entity to be held jointly and severally liable. To the extent that the entity was itself a fiduciary, then the entity can be held liable in that capacity. WestCo was a fiduciary in its capacity as the managing member of DVRC. ReathCo was a fiduciary in its capacity as general partner of Penfold and in its capacity as the managing agent through which WestCo managed DVRC. To the extent that either entity was not itself a fiduciary or did not act in a fiduciary capacity, then that entity can be held jointly liable with Manheim under a theory of aiding and abetting. Manheim controlled WestCo and ReathCo, and his knowledge is attributed to those entities, making them knowing participants in Manheim's breaches of fiduciary duty.[16]

This decision therefore does not organize its legal analysis by parsing through Counts I, II, and XIV. This decision focuses on the central issue in dispute: Whether Manheim breached his fiduciary duties by engaging in disloyal conduct that took the form of (i) self-dealing transfers and (ii) transfers to his alleged cronies. Because Manheim is the pivotal actor, this decision focuses on Manheim as the key defendant.

---

*Eshleman*, 187 A. at 28–29 (imposing personal liability jointly and severally on corporation that received a self-interested management fee and on its individual owners who were the ultimate controllers of the entity).

[16] *In re Dole Food Co., Inc. S'holder Litig*., 2015 WL 5052214, at *39 (Del. Ch. Aug. 27, 2015) (holding entity, through which controller acted, liable jointly and severally with controller as an aider and abettor of the controller's breach of duty); *In re Emerging Commc'ns, Inc. S'holders Litig.*, 2004 WL 1305745, at *38 (Del. Ch. May 3, 2004) (same).

Before addressing the central issue in dispute, this decision considers a series of defenses. Those defenses marginally reduce the scope of the transfers that the plaintiffs can challenge. After addressing the central claim, this decision turns to the remedy.

## A. The Defenses

Manheim leads with a series of defenses through which he seeks to eliminate or, at a minimum, reduce the scope of the plaintiffs' claim. Those defenses largely fail.

### 1. Standing

Manheim advances two defenses based on the concept of standing. The first is temporal and asserts that the plaintiffs cannot challenge any transfers that took place before they became members of DVRC. The second focuses on the entity that made the transfers and asserts that the plaintiffs only can challenge transfers made by DVRC.

### a. The Contemporaneous Ownership Requirement

Manheim's first argument asserts that Ban and Bamford cannot challenge any transfers by DVRC that preceded the execution of the Admission Agreement. Through that agreement, Ban and Bamford formally became members of DVRC. Invoking an alternative-entity version of the contemporaneous ownership requirement, Manheim argues that because Ban and Bamford were not members of DVRC until the Admission Agreement was executed, they lacked standing to assert any claims on behalf of DVRC before that event took place.

There is a threshold question about when the contemporaneous ownership requirement would have been satisfied. Manheim suggests that because the Admission Agreement was executed in early June 2016, that is when the plaintiffs gained standing to

59

sue. But Manheim agreed with his counterparts that the Admission Agreement became effective as of June 1, 2015. FF ¶ 28(b). Although that agreement would not bind a third party, it does bind Manheim. Equity will not permit Manheim or the entities that he controls to disavow that commitment and contend that Bamford and Ban did not gain standing to sue until one year later.

Regardless, Manheim's attempt to invoke the contemporaneous ownership requirement does not succeed. Relying on *Lambrecht v. O'Neal*, 3 A.3d 277 (Del. 2010), this court previously rejected the defendants' argument that the plaintiffs could not assert claims based on events that preceded the Reorganization. *See Dismissal Decision*, 2020 WL 967942, at *24–25.

> The Delaware Supreme Court has held that when an investor in a parent entity seeks to litigate derivative claims on behalf of its subsidiary, and when an intervening transaction and the strict operation of the contemporaneous ownership requirement would cut off the ability of parent investors to sue, then the wrong for purposes of analyzing the contemporaneous ownership requirement at the parent-entity level is the failure of the parent to cause the subsidiary to assert its claims. In that setting, the analysis does not require comparing when the investor in the parent entity acquired its interest with when the subsidiary's claim arose.

*Id.* at *25 (citation omitted).

As framed in *Lambrecht*, neither the contemporaneous ownership requirement nor the continuous ownership requirement forecloses an entity's ability to bring its own claims:

> A post-merger double derivative action is not a de facto continuation of the pre-merger derivative action. It is a new, distinct action in which standing to sue double derivatively rests on a different temporal and factual basis— namely, the failure of the [parent entity], post-merger, to enforce the premerger claim of its wholly-owned subsidiary.

60

3 A.3d at 290; *see Lewis v. Anderson*, 477 A.2d 1040, 1050 (Del. 1984) (holding that there was no impediment to New Conoco, the post-transaction entity, pursuing its own claims). The stockholders in *Lambrecht* could assert that new claim derivatively if they could establish demand futility as to the new board of directors and the new claim. 3 A.3d at 290

In the *Dismissal Decision*, the court explained that the facts of this case fall within the *Lambrecht* rule. 2020 WL 967942, at *26–27. As limited partners in Penfold, the plaintiffs can assert claims on behalf of Penfold's subsidiary, DVRC, in a double derivative action, including claims based on events pre-dating the Reorganization, as long as demand would be excused. *Id.* at *27. Manheim has never argued that demand would be required as to a claim against him for breach of fiduciary duty. Manheim controls both Penfold's general partner and DVRC's managing member, so demand is doubly futile. *Id.* at *26.

The plaintiffs also satisfy the more general test for equitable standing, viz., the threat of a "complete failure of justice." *Schoon v. Smith*, 953 A.2d 196, 208 (Del. 2008).

> Bamford, Ban, and Manheim are the only human beings with equity interests in Penfold. Manheim will not sue himself, nor will he cause ReathCo (which he controls) to bring suit. As a result, if Bamford and Ban lack standing to sue, then there will be "no procedural vehicle to remedy the claimed wrongdoing."

*Dismissal Decision*, 2020 WL 967942, at *26 (quoting *Lambrecht*, 3 A.3d at 283).

Bamford and Ban therefore have standing to pursue double-derivative claims based on matters that took place before the effective date of the Reorganization. But even if they did not, they could still challenge the transfers from DVRC to ReathCo that began after the June 2017 Meeting. Manheim claims that those transfers complied with the DVRC

61

Management Agreement, which Manheim and Ban executed in December 2014. But as the court has found, Manheim terminated the DVRC Management Agreement on June 30, 2015. The transfers that began after the June 2017 Meeting were new transactions, and the plaintiffs have standing to challenge them.

### b. The Entity That Made The Transfers

Manheim's second defense focuses on the entity that made the transfers. The plaintiffs have not limited themselves to transfers from DVRC. They also have challenged the following transfers from WestCo:

- In 2014, WestCo incurred various hay-related expenses totaling $31,115.35 as part of its hay trading business. JX 1517 at '062.

- In 2016, WestCo made a cash transfer to ReathCo of $5,767. JX 914.

- Between 2014 and 2017, WestCo paid a total of $44,495.57 in expenses for the Union League. In 2014 and 2015, the expenses were labeled "Marketing Fee." In 2015 and 2016, the expenses were labeled "Meals & Entertainment." JX 1517 at '066–67.

- Between 2014 and 2019, WestCo extended loans to ReathCo in the amount of $1,614,670. JX 1796 (citing JX 914; JX 915; JX 1065; JX 1164).

As Manheim correctly argues, any claim based on these transfers belongs to WestCo. Those claims do not belong to DVRC. No one has asserted any claims on behalf of WestCo. The plaintiffs named WestCo as a defendant. They did not name WestCo as a nominal defendant on whose behalf they were asserting claims.

Bamford and Ban could have challenged the unsecured loan in the amount of $1,798,332.17 that Manheim caused DVRC to make to WestCo on August 10, 2018. The transaction between two Manheim-controlled entities plainly conferred a personal benefit

on Manheim. Bamford and Ban refer to this transaction in their briefing, but they do not challenge it.

### 2. Laches

The second defense that Manheim raises is laches. "Laches is an affirmative defense that the plaintiff unreasonably delayed in bringing suit after the plaintiff knew of an infringement of his rights, thereby resulting in material prejudice to the defendant." *U.S. Cellular Inv. Co. of Allentown v. Bell Atl. Mobile Sys., Inc.*, 677 A.2d 497, 502 (Del. 1996). "Absent some unusual circumstances, a court of equity will deny a plaintiff relief when suit is brought after the analogous statutory period." *Id.* "[T]he general law in Delaware is that the statute of limitations begins to run, *i.e.*, the cause of action accrues, at the time of the alleged wrongful act, even if the plaintiff is ignorant of the cause of action." *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *4 (Del. Ch. July 17, 1998), *aff'd*, 725 A.2d 441 (Del. 1999).

Here, the operative statutory period is three years. *See* 10 *Del. C.* § 8106(a). Bamford filed this lawsuit on January 4, 2019. By default, challenges to payments made before January 4, 2016, are untimely.[17]

---

[17] Without explanation, Manheim accepts November 30, 2018, as the relevant date for the laches analysis. Bamford initially filed suit on that date, then dismissed the case less than a month later. The plaintiffs do not appear to challenge any payments made between November 30, 2015, and January 4, 2016. As a result, it does not matter which date the court uses for the laches determination.

A plaintiff can avoid a timeliness bar through tolling doctrines. One is fraudulent concealment, which applies when a defendant acted affirmatively to prevent the plaintiff from gaining knowledge of the facts giving rise to the claim. Another is equitable tolling, which applies when the plaintiff reasonably relied on the competence and good faith of a fiduciary. *See Stone & Paper Invs., LLC v. Blanch*, 2021 WL 3240373, at \*33 (Del. Ch. July 30, 2021); *Weiss v. Swanson*, 948 A.2d 433, 451 (Del. Ch. 2008). The limitations period is only tolled until a plaintiff is on inquiry notice. Once a plaintiff discovers the injury—or should have discovered the injury by exercising reasonable diligence—the limitations period will begin to run. *See Weiss*, 948 A.2d at 451. "[N]o theory will toll the statute beyond the point where the plaintiff was objectively aware, or should have been aware, of facts giving rise to the wrong." *In re Tyson Foods, Inc.*, 919 A.2d 563, 585 (Del. Ch. 2007).

Ban has no basis for avoiding the timeliness bar. Until his suspension in May 2018 and subsequent removal in June 2018, Ban ran the day-to-day operations of the business. He knew what was going on.

Bamford is in a different position and presents a closer question. He argues that his time for filing suit should not begin to run "until Ban disclosed [Manheim's] defalcations to Bamford in mid-2018." Dkt. 365 at 13 n.3.

Although Bamford was not involved with the EB-5 Business to as great a degree as Ban, he was sufficiently involved that he should have made more timely efforts to pursue a lawsuit against Manheim. Bamford testified that by late 2017, he was frustrated that

DVRC was not generating the magnitude of distributions that he expected, and he questioned the level of expenses that DVRC was incurring. *See* Bamford Tr. 162. Bamford made a conscious decision not to pursue his concerns. He "decided not to get involved and clip a coupon." JX 719 at '007. Having decided not to pursue his claims, Bamford cannot claim that he was not on inquiry notice.

Any challenges to payments made before January 4, 2016, are barred by laches. The effect of this ruling is relatively minimal. It prevents some challenges to expenses, but nothing more.

### 3. Ratification And Acquiescence

Manheim contends that the doctrines of ratification and acquiescence preclude any challenge to a range of transfers, most notably any management fees ostensibly paid under the DVRC Management Agreement. Manheim blends the two doctrines together. Neither applies.

"Ratification is an equitable defense that precludes a party who has accepted the benefits of a transaction from thereafter attacking it." *Genger v. TR Invs., Inc.*, 26 A.3d 180, 195 (Del. 2011) (cleaned up). Ratification may be express or implied based on a party's conduct. "Implied ratification occurs where the conduct of a complainant, subsequent to the transaction objected to, is such as reasonably to warrant the conclusion that he has accepted or adopted it." *Id.* (cleaned up).

Acquiescence is similar. Acquiescence can bar a claim as a matter of equity when a plaintiff

65

has full knowledge of his rights and the material facts and (1) remains inactive for a considerable period of time; or (2) freely does what amounts to recognition of the complained of act; or (3) acts in a manner inconsistent with the subsequent repudiation, which leads the other party to believe the act has been approved.

*Klaassen v. Allegro Dev. Corp.*, 106 A.3d 1035, 1047 (Del. 2014) (cleaned up). "The doctrine of acquiescence effectively works an estoppel: where a plaintiff has remained silent with knowledge of her rights, and the defendant has knowledge of the plaintiff's silence and relies on that silence to the defendant's detriment, the plaintiff will be estopped from seeking protection of those rights." *Lehman Bros. Hldgs. Inc. v. Spanish Broad. Sys., Inc.*, 2014 WL 718430, at *9 (Del. Ch. Feb. 25, 2014), *aff'd*, 105 A.3d 989 (Del. 2014).

The facts do not support either ratification or acquiescence. For starters, Ban did not acquiesce to the DVRC Management Agreement by participating in drafting it. When Manheim and Ban prepared the DVRC Management Agreement, Ban was working for Manheim and beholden to him. He had no real ability to object to it.

Ban also did not ratify or acquiesce in the DVRC Management Agreement through his subsequent conduct. The agreement only remained in place until June 30, 2015, when Manheim terminated it along with the WestCo Management Agreement. After that point, there was no reason for Ban to object to a terminated agreement.

The only event that might contribute to a defense of ratification or acquiescence is the June 2017 Meeting, when Manheim proposed shifting DVRC to the Management Company Structure. Ban did not acquiesce to that initiative. During the June 2017 Meeting, Ban supported the Management Company Structure, but he objected vigorously to using

ReathCo as the management company. Because of Ban's objection, the WestCo Board resolved to investigate the alternatives further. After the June 2017 Meeting, Ban followed up on his objections.

After the June 2017 Meeting, DVRC transferred funds to ReathCo. Manheim has pointed out that Ban was aware of the transfers, but he is incorrect that Ban did not object to them. Ban made his position clear during the June 2017 Meeting. He also objected to transfers to ReathCo after the June 2017 Meeting. He did not object to each and every transfer, which would have been tiresome and unnecessary. He also recognized that some of the transfers to ReathCo were for legitimate expenses. Ban understood that once the WestCo Board decided upon a management company and a fee structure, there would be a true up.

Because of how events unfolded, Ban did not acquiesce to the transfers to ReathCo. Nor did he ratify those transfers. Whether viewed through the lens of acquiescence or ratification, Ban could challenge the transfers to ReathCo.

The defenses have even less purchase on Bamford. Manheim argues that Bamford ratified the DVRC Management Agreement and acquiesced in the transfers to ReathCo based on what occurred during the June 2017 Meeting, but those events were not sufficient. During the June 2017 Meeting, there was a consensus that DVRC would move to the Management Company Structure. Beyond that, the WestCo Board did not make specific determinations about the management company, the amount of the management fee, or what expenses it would cover. In light of Ban's objection, the WestCo Board committed to

investigate the options further. Just as those events are not sufficient to foreclose Ban's challenge, they do not prevent Bamford's challenge.

Manheim also observes that in August 2018, Bamford requested information about the management fees paid to ReathCo and was provided with the DVRC Management Agreement. *See* JX 931. Instead of objecting to the agreement, Bamford filed this lawsuit three months later, in which he challenged the transfers from DVRC to ReathCo. Bamford acted promptly; he did not acquiesce.

In a related line of argument, Manheim contends that Ban and Bamford understood that the WestCo Board approved a management fee for ReathCo during the June 2017 Meeting, then decided to contend otherwise as a litigation invention. They cite a litigation memorandum that Ban prepared which referred to the payment of management fees. *See* JX 991. They also cite an email exchange in which Ban sent the minutes of the June 2017 Meeting to Bamford where they discussed whether the WestCo Board had approved a management fee. *See* JXs 894–95.

Zooming out from these specific documents, it is apparent that after Ban and Bamford began sharing their concerns about DVRC, they attempted to figure out how Manheim was extracting cash from the EB-5 Business without sharing it with them. *See* JX 734; JX 757. They decided that it had to be through a combination of a management fee and reimbursement of expenditures. Their next step was to attempt to figure out how the management fee was put in place. That exercise led them to the minutes of the June 2017 Meeting, which was the only documented time that the WestCo Board discussed the

relationship between ReathCo and DVRC. It is understandable that Manheim would view their efforts skeptically as an attempt to manufacture a theory, just as Ban and Bamford have viewed skeptically Manheim's efforts to recharacterize transactions and put backdated agreements into place as attempts to manufacture defenses. Human memory is inherently fallible and subject to natural evolution over time. It is neither surprising nor problematic that Bamford and Ban investigated the origins of the management fee and attempted to reconstruct what took place at the June 2017 Meeting. They were trying to figure out what happened.

In a related argument, Manheim observes that the plaintiffs did not challenge the validity of the DVRC Management Agreement in their complaints. That makes sense. They challenged the transfers that Manheim caused DVRC to make. The DVRC Management Agreement was Manheim's defense. The plaintiffs could have anticipated Manheim's defense and targeted it preemptively, but their decision to let Manheim raise his defense does not mean that they thought the DVRC Management Agreement remained valid.

Neither ratification nor acquiescence helps Manheim. At best for Manheim, the defenses might operate against Ban, but because the claims in this case are derivative, Bamford can maintain them.

### 4. Exculpation

Finally, Manheim argues that the plaintiffs cannot recover any damages whatsoever because he sought to insert an impressively broad exculpatory provision (the "Exculpatory Provision") in a version of the DVRC LLC Agreement that he adopted unilaterally in

February 2018 (the "Fourth LLC Agreement"). The adoption of the Exculpatory Provision was itself a self-interested act, and it is invalid because Manheim failed to prove that the implementation of the Exculpatory Provision was entirely fair.

The Exculpation Provision provides, in relevant part:

> No Indemnified Representative of the Company, or any of their respective Affiliates, representatives or agents (each, a "Covered Person") shall be liable to the Company or any other Covered Person for any loss, damage or claim incurred by reason or any act or omission (including for any breach of contract or breach of fiduciary or other duties) performed or omitted by such Covered Person; provided, however, that this sentence shall not limit or eliminate liability for any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing.

> To the maximum extent permitted by applicable law, each Member hereby waives any claim or cause of action against the Indemnified Representatives or any of their respective Affiliates, employees, agents and representatives for any breach of any fiduciary duty to the Company or the Members, including as may result from a conflict of interest between the Company or any of its subsidiaries and such Person in his or her capacity as a Member.

JX 2012 § 11.3 (formatting added). An "Indemnified Representative" is defined as a current or former manager or executive officer of DVRC. *Id.* § 11.2.

Through this provision, Manheim sought to insulate himself from liability for "any loss, damage or claim," including "for any breach of contract or breach of fiduciary or other duties." *See id.* § 11.3. The only liability that Manheim would have would be for conduct that "constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing." *Id.* The implied covenant is a means of implying terms that do not expressly exist in an agreement. Manheim thus sought to eliminate liability for any breach of fiduciary duty or any breach of an express term of the contract, while only preserving

70

liability for a *bad faith* (i.e., knowing) violation of an implied term. Since an implied

provision will, by definition, not be express, that residual category of potential provides

little comfort.[18]

---

[18] As extreme as that degree of exculpation might seem, it adheres to the statutory floor that the Delaware Limited Liability Company Act (the "LLC Act") imposes. *See* 6 *Del. C.* § 18-1101(e) ("A limited liability company agreement may provide for the limitation or elimination of any and all liabilities for breach of contract and breach of duties (including fiduciary duties) of a member, manager or other person to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement; *provided, that a limited liability company agreement may not limit or eliminate liability for any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing*." (emphasis added)). When the General Assembly adopted that provision, Delaware decisions had not yet distinguished cleanly between the concept of bad faith under tort law and the role that the implied covenant of good faith and fair dealing plays as a source of implied contractual terms. *See, e.g.*, *Gerber v. Enter. Prods. Hldgs., LLC*, 67 A.3d 400, 418–19 (Del. 2013), *overruled on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808 (Del. 2013); *Renco Gp., Inc. v. MacAndrews AMG Hldgs. LLC*, 2015 WL 394011, at \*7 n.74 (Del. Ch. Jan. 29, 2015). It seems possible that by preventing exculpation for bad faith violations of the implied covenant, the drafters of the LLC Act were seeking preserve accountability for intentional misconduct that ran contrary to the best interests of the entity. But in its role as a doctrine for implying contract terms, the implied covenant cannot fulfill that mission. The implied covenant does not operate as a fiduciary substitute. *Wood v. Baum*, 953 A.2d 136, 143 (Del. 2008) ("[T]he Complaint does not purport to allege a 'bad faith violation of the implied contractual covenant of good faith and fair dealing.' The implied covenant of good faith and fair dealing is a creature of contract, distinct from the fiduciary duties that the plaintiff asserts here." (cleaned up)). Establishing a breach of the implied covenant is notoriously difficult. *See Oxbow Carbon & Mins. Hldgs. v. Crestview-Oxbow Acq. LLC*, 202 A.3d 482, 502–08 (Del. 2019). And express terms displace it, enabling alternative entity agreements to authorize a decision maker to consider and act based on its own interests, irrespective of the entity's interests. *See, e.g.*, Paul M. Altman & Srinivas M. Raju, *Delaware Alternative Entities and the Implied Contractual Covenant of Good Faith and Fair Dealing Under Delaware Law*, 60 Bus. Law. 1469, 1484 (2005) (recommending that alternative entity agreements provide that the decision maker be granted discretion to "consider only such interests and factors as it desires, including its own interests," and eliminate any "duty or obligation to give any

Not content with this capacious elimination of liability, Manheim went further and provided that each member of DVRC "hereby waives any claim or cause of action . . . for any breach of any fiduciary duty." JX 2012 § 11.3. Through this language, Manheim sought to make the Exculpatory Provision not just prospective, but retrospective as well.

Accepting for purposes of analysis that Manheim had the legal authority to adopt the Fourth LLC Agreement, including the Exculpatory Provision, it remains a self-interested decision that can be reviewed in equity.[19] It was not equitable for Manheim to implement the Fourth LLC Agreement unilaterally in an effort to eliminate all liability, prospectively and retrospectively, for any fiduciary breach.

Fiduciaries who control an entity can adopt prospective protective provisions, including exculpatory provisions, particularly if the provisions do not implicate the duty of

---

consideration to any interest of or factors affecting the" entity or its investors). Rather than preserving a measure of accountability by imposing a meaningful floor, the statutory limit on exculpation sets the bar at the band sill.

[19] *Sample v. Morgan*, 914 A.2d 647, 672 (Del. Ch. 2007) ("Corporate acts thus must be 'twice-tested'—once by the law and again by equity."); *accord Quadrant Structured Prods. Co. v. Vertin*, 2014 WL 5465535, at *3 (Del. Ch. Oct. 28, 2014) ("Delaware law adheres to the twice-testing principle."), *aff'd*, 151 A.3d 447 (Del. 2016) (TABLE); *see In re Pure Res., Inc. S'holders Litig.*, 808 A.2d 421, 434 (Del. Ch. 2002) ("Nothing about [the doctrine of independent legal significance] alters the fundamental rule that inequitable actions in technical conformity with statutory law can be restrained by equity."); *see also Schnell v. Chris–Craft Indus., Inc.*, 285 A.2d 437, 439 (Del. 1971) ("[I]nequitable action does not become permissible simply because it is legally possible."); *Marino v. Patriot Rail Co.*, 131 A.3d 325, 336 (Del. Ch. 2016) ("Post–1967 decisions by the Delaware Supreme Court . . . rendered untenable the strong-form contention that a statutory grant of authority necessarily foreclosed fiduciary review.").

72

loyalty. For example, in *Orloff v. Shulman*, the fiduciaries who controlled a corporation adopted an exculpatory provision under Section 102(b)(7) at a time when minority stockholders had filed a books-and-records action. 2005 WL 3272355, at *6 (Del. Ch. Nov. 23, 2005). The plaintiffs alleged that the defendants approved the provision "under the threat of imminent litigation, and breached their fiduciary duties by self-interestedly protecting themselves against litigation that they knew would soon name them as defendants." *Id.* This court dismissed the claim, finding that the plaintiffs failed to adequately allege "facts creating a reasonable doubt that the directors were disinterested or independent when they made their decision to approve the certificate amendment." *Id.* at *13. By definition, a provision under Section 102(b)(7) cannot protect directors from claims that implicate the duty of loyalty. Nor can it eliminate liability retrospectively. *See* 8 *Del. C.* § 102(b)(7) ("No such provision shall eliminate or limit the liability of a director for any act or omission occurring prior to the date when such provision becomes effective.").

Manheim sought to eliminate any liability for breaches of the duty of loyalty. He attempted to adopt a provision that not only limited liability prospectively, but also retrospectively.

Manheim points out that the Exculpatory Provision also covered Bamford and Ban. Nominally equal treatment is generally desirable, and it is equitable when the recipients are similarly situated and benefit to a similar extent. But if the recipients of nominally equal treatment are differently situated, then nominally equal treatment can manifest as

differential (even discriminatory) treatment. Delaware law recognizes this reality, but our precedents have applied it cautiously because it represents a departure from the generally desirable principle of equal treatment. For example, our law recognizes that if a merger has the additional effect of extinguishing the standing of minority stockholders to bring derivative claims against the fiduciaries who approved the merger, then those fiduciaries receive a non-ratable benefit from the merger, even if the fiduciaries nominally receive the same *pro rata* consideration as all other stockholders. *See In re Primedia, Inc. S'holders Litig.*, 67 A.3d 455, 487 (Del. Ch. 2013). And this court has recognized that when a fiduciary has a pressing need for liquidity, a liquidity-generating transaction can confer a non-ratable benefit on the fiduciary—even if the fiduciary nominally receives the same *pro rata* consideration as all other stockholders. *See In re Mindbody, Inc.*, 2020 WL 5870084, at *15 (Del. Ch. Oct. 2, 2020) (collecting cases).

The same logic applies here. Manheim faced claims for breach of the duty of loyalty based on his past conduct. Manheim sought to cut off that threat and benefit himself through the adoption of the Exculpatory Provision. Superficially, the Exculpatory Provision treated all Covered Persons equally. But because Manheim had engaged in misconduct and faced litigation risk, it was really Manheim who benefitted.

Manheim did not attempt to prove that the Exculpatory Provision was entirely fair. Manheim therefore cannot rely on the Exculpatory Provision to protect him.[20]

## B. The Standard Of Review

The plaintiffs sought to prove that Manheim breached his fiduciary duties by causing DVRC to make the challenged transfers. The core fiduciary principle at issue is the obligation of loyalty, "the equitable requirement that, with respect to the property subject to the duty, a fiduciary always must act in a good faith effort to advance the interests of his beneficiary." *U.S. West, Inc. v. Time Warner Inc.*, 1996 WL 307445, at \*21 (Del. Ch. June 6, 1996) (Allen, C.). "Most basically, the duty of loyalty proscribes a fiduciary from any means of misappropriation of assets entrusted to his management and supervision." *Id.*

Entity law distinguishes between the standard of conduct that governs a fiduciary's behavior and the standard of review that a court applies to determine whether the standard

---

[20] As a fallback, Manheim argues that the DVRC LLC Agreement already contained an exculpatory provision, which protects him in any event. Section 11.2 of the DVRC LLC Agreement only covers "the Member" and "every officer of the Company." JX 27 § 11.02(a). It does not extend to controllers. It also only applies if the covered party's conduct "did not constitute gross negligence, gross misconduct or fraud." *Id.* Manheim was not entitled to exculpation in his capacity as DVRC's controller. *See In re Atlas Energy Res., LLC*, 2010 WL 4273122, at \*8–9 (Del. Ch. Oct. 28, 2010) (holding that provision in LLC agreement that eliminated fiduciary duties but did not mention LLC's controller did not apply to controller). Regardless, his self-dealing qualified as gross misconduct.

of conduct was breached.[21] Entity law generally uses three standards of review: a default standard of review that is highly deferential and known as the business judgment rule; an intermediate standard of review known as enhanced scrutiny; and an onerous standard of review known as the entire fairness test. *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 457–59 (Del. Ch. 2011). "In each manifestation, the standard of review is more forgiving of [defendant fiduciaries] and more onerous for [the] plaintiffs than the standard of conduct." *Chen*, 87 A.3d at 667.

When a fiduciary who controls an entity engages in self-dealing, then equity requires that the fiduciary prove that the self-dealing transaction was entirely fair to the entity and its minority investors. *See Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1239 (Del. 2012). The controller may seek to avoid the full measure of this standard of review by implementing protections for the entity and its minority investors. One protective measure involves the controller establishing a committee composed of independent and disinterested individuals and empowering the committee with the authority to negotiate the terms of the transaction and determine whether it takes place. Another protective device is

---

[21] *Chen v. Howard-Anderson*, 87 A.3d 648, 666 (Del. Ch. 2014); *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 35–36 (Del. Ch. 2013). *See generally* William T. Allen, Jack B. Jacobs & Leo E. Strine, Jr.*, Realigning the Standard of Review of Director Due Care with Delaware Public Policy: A Critique of Van Gorkom and its Progeny as a Standard of Review Problem*, 96 Nw. U. L. Rev. 449, 451–52 (2002); William T. Allen, Jack B. Jacobs & Leo E. Strine, Jr., *Function Over Form: A Reassessment of the Standards of Review in Delaware Corporation Law*, 56 Bus. Law. 1287, 1295–99 (2001); Melvin Aron Eisenberg, *The Divergence of Standards of Conduct and Standards of Review in Corporate Law*, 62 Fordham L. Rev. 437, 461–67 (1993).

to condition the transaction on the approval of the independent investors, such as by conditioning the transaction on the affirmative vote of a majority of the shares owned by stockholders who are not affiliated with the controller.

If the controller agrees on both protections up front, then the deferential business judgment rule applies to the transaction. *Flood v. Synutra Int'l, Inc.*, 195 A.3d 754, 761–62 (Del. 2018). If a controller agrees to only one of the protections, or does not agree to both protections up front, then the most that the controller can achieve is a shift in the burden of proof such that the plaintiff challenging the transaction must prove unfairness. *Ams. Mining*, 51 A.3d at 1240.

Manheim controlled DVRC through his control over WestCo, DVRC's managing member. Manheim controlled WestCo through his ownership of 70% of WestCo's common stock. Manheim never implemented any procedural protections to limit or disable his control for purposes of any of the transfers at issue in the case. Manheim therefore bore the burden of proving that the transfers at issue were entirely fair.[22]

_____

[22] As an alternative basis for shifting the burden of proof on the management fees to ReathCo, Manheim argues that the burden to show unfairness shifts because the plaintiffs voted as members of the WestCo Board during the June 2017 Meeting to approve a management fee for ReathCo equal to 0.25% of AUM. Dkt. 364 at 32–33. This decision has found that the WestCo Board did not approve a management fee for ReathCo during the June 2017 Meeting. *See*, *supra*, Part I.O. Manheim also does not offer any legal support for the proposition that Ban and Bamford's actions as directors would shift the burden of proof in an investor-level challenge to the fairness of the management fees. Manheim cites *Kahn v. Lynch Communications System, Inc.*, 638 A.2d 1110, 1116–17 (Del. 1994), but that decision addressed (i) the effect of a special committee on the burden of proving fairness and (ii) the effect of a majority of the minority vote on the burden of proving

"The concept of fairness has two basic aspects: fair dealing and fair price." *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983). Fair dealing "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained." *Id.* Fair price "relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock." *Id.* Although the two aspects may be examined separately, "the test for fairness is not a bifurcated one as between fair dealing and price. All aspects of the issue must be examined as a whole since the question is one of entire fairness." *Id.* That said, "perfection is not possible, or expected." *Id.* at 709 n.7.

Because the entire fairness test is not bifurcated, "the two aspects of the entire fairness standard interact." *Dole*, 2015 WL 5052214, at *34. "A strong record of fair dealing can influence the fair price inquiry, reinforcing the unitary nature of the entire fairness test. The converse is equally true: process can infect price." *Reis*, 28 A.3d at 467 (collecting authorities).

"Fair price can be the predominant consideration in the unitary entire fairness inquiry." *Dole*, 2015 WL 5052214, at *34. The fair price analysis "is part of the entire

---

fairness. It did not address what would happen if a director voted in favor of a transaction and then subsequently pursued a derivative action in his capacity as a stockholder.

fairness standard of review; it is not itself a remedial calculation." *Reis*, 28 A.3d at 465. "For purposes of determining fairness, as opposed to crafting a remedy, the court's task is not to pick a single number, but to determine whether the transaction price falls within a range of fairness." *Dole*, 2015 WL 5052214, at \*33.

"[A] demonstrably fair price is inconsistent with the notion that a fiduciary disloyally attempted to channel value to himself or third parties at the expense of the beneficiaries of his duties." *In re Tesla Motors, Inc. S'holder Litig.*, 2022 WL 1237185, at \*32 (Del Ch. Apr. 27, 2022). But establishing a price that falls within the range of fairness may not be dispositive if a fiduciary has engaged in acts of fraud, misrepresentation, self-dealing, or gross and palpable overreaching. *See Weinberger*, 457 A.2d at 714. In those settings, the defendant fiduciary "does not meet the entire fairness standard simply by showing that the price fell within a reasonable range that would be considered fair." *William Penn P'ship v. Saliba*, 13 A.3d 749, 756–57 (Del. 2011). Depending on the facts and the nature of the loyalty breach, the beneficiaries may be entitled to "a 'fairer' price." *Reis*, 28 A.3d at 467.

## C. The ReathCo Management Fees

The plaintiffs sought to prove at trial that Manheim breached his fiduciary duties by causing DVRC to pay management fees to ReathCo. It is undisputed that Manheim received the full benefit of the management fees. It is also undisputed that the management

fees and his employment benefits represented Manheim's only source of compensation from DVRC.[23]

Between 2017 and 2020, ReathCo received $5,652,406 in management fees, ostensibly for amounts due for the years 2014–2020. The transfers for management fees did not begin until after the June 2017 Meeting. The transfers were recharacterized as management fees during the preparation of DVRC's audited financial statements for 2017. As part of that process, two DVRC employees calculated the amounts that were due for management fees under the DVRC Management Agreement and included interest on past-due amounts from prior years. They then treated any transfers from DVRC to ReathCo as the payment of a management fee.

The plaintiffs do not challenge the full amount of the management fees. They agree Manheim was entitled to receive compensation of $300,000 per year. Accordingly, the plaintiffs do not challenge the first $2,100,000 in management fees ($300,000 * 7 = $2,100,000). Deducting that amount leaves excess management fees of $3,552,406.

### 1.    The Management Fees: Fair Dealing

The evidence pertinent to the dimension of fair dealing weighs decidedly in favor of the plaintiffs. That is true whether the court examines the original entry into the DVRC

---

[23] The plaintiffs identified $58,540.14 in transfers that DVRC made to lease luxury automobiles for Manheim between December 2017 and December 2019. That amount works out to an average of $2,439.17 per month, which is a hefty car payment. Beyond referring to the luxury cars in passing, the plaintiffs did not devote attention to the car-related transfers. This decision therefore does not consider them.

Management Agreement, the decision made during the June 2017 Meeting, or the transfers made after the June 2017 Meeting.

### a. The Original Entry Into The DVRC Management Agreement

The circumstances surrounding the original entry into the DVRC Management Agreement did not bear any of the hallmarks of fair dealing. It was an interested transaction that Manheim and Ban entered into unilaterally under circumstances where they both benefited from the agreement.

The fair dealing inquiry examines how the transaction was negotiated. There was no negotiation over the DVRC Management Agreement. Manheim and Ban drafted it. Manheim decided on a fee equal to 0.25% of AUM. Ban was not in a position to negotiate with Manheim because he was neither independent nor disinterested. Ban worked for Manheim, so he was not independent. Ban also benefitted from the DVRC Management Agreement through the Ban Profit-Sharing Agreement. To the extent that DVRC paid a fee to ReathCo, Manheim and Ban each would receive half.

The fair dealing inquiry also embraces questions of who approved the transaction. There was never any formal approval of the DVRC Management Agreement, whether by the WestCo Board or by anyone else. Manheim and Ban executed it. When they acted, they comprised the only directors of WestCo, which was the sole member of DVRC, but they never took action as directors. The stockholders of WestCo never approved the DVRC Management Agreement.

### b. The June 2017 Meeting

The decision made by the WestCo Board during the June 2017 Meeting did not bear the hallmarks of fair dealing. The WestCo Board did not have a disinterested and independent majority. It did not have full information about the decision that Manheim asked the directors to make. Most important, the WestCo Board did not make a decision to pay ReathCo a management fee in accordance with the DVRC Management Agreement.

When the WestCo Board convened for the June 2017 Meeting, the WestCo Board did not have a disinterested and independent majority for purposes of determining whether to pay a management fee to ReathCo:

- Manheim was interested in the management fee as the controller of ReathCo.

- Ban was not independent because he was subject to Manheim's control as an employee of DVRC and an officer of WestCo.

- Frank was not independent because he was subject to Manheim's control as an employee of DVRC, and he was Manheim's brother.

- Mezzaroba was not independent because he was subject to Manheim's control as an employee of DVRC. He also was a personal friend of Manheim's.[24]

Only Bamford was nominally independent, yet he had been Manheim's close friend since childhood, and at that point, he still trusted Manheim completely. Since that meeting, Ban

---

[24] Mezzaroba's friendship with Manheim would not be enough, standing alone, to call Mezzaroba's independence into question. But when viewed holistically in the context of Mezzaroba's employment relationship and Manheim's status as a controller, the friendship contributes to a finding that Mezzaroba was not independent of Manheim.

and Bamford have become adverse to Manheim. During the June 2017 Meeting, neither was independent of him.

During the June 2017 Meeting, the WestCo Board did not have full information about the DVRC Management Agreement or the decisions that Manheim was asking the directors to make. Manheim did not make clear that the DVRC Management Agreement had terminated in June 2015. There is no indication that Manheim discussed the significant differences between the circumstances that prevailed when he and Ban originally executed the DVRC Management Agreement and the circumstances that prevailed in June 2017. To reiterate, when Manheim and Ban originally created the DVRC Management Agreement, they were operating under the Ban Profit-Sharing Agreement, so they each would receive half of the benefits of the DVRC Management Agreement. The fee they contemplated would have provided compensation for both Manheim and Ban, not just Manheim. By June 2017, Manheim and Ban terminated the Ban Profit-Sharing Agreement, so any revival of the DVRC Management Agreement only would benefit Manheim.

In addition, the capital structure of DVRC had changed significantly. When Manheim and Ban entered into the DVRC Management Agreement, DVRC was a wholly owned subsidiary of WestCo, and the rights to the cashflows from the EB-5 Business were divided through a complex set of relationships that included the Ban Profit-Sharing Agreement, the ownership stakes that Manheim, Ban, and Mandle held in WestCo, and the beneficial interest that Bamford held through the 2012 and 2015 EastCo Loans. In connection with the Reorganization, Manheim, Ban, and Bamford agreed to a more

transparent and straightforward allocation of cash flows by giving Manheim, Ban, and Bamford an equity participation in DVRC through Penfold's 90% non-voting member interest. No one mentioned the DVRC Management Agreement during the negotiations over the Reorganization, and reviving the management fee to ReathCo was inconsistent with the agreements that Manheim, Ban, and Bamford had reached.

The WestCo Board did not consider these important issues during the June 2017 Meeting. All of the witnesses agree that there was relatively little discussion of the DVRC Management Agreement. Manheim, Frank, and Mezzaroba asserted that the discussion was minimal because everyone took the DVRC Management Agreement as a given. Ban asserted that the discussion was minimal because the DVRC Management Agreement had terminated and Manheim was proposing a new arrangement. Bamford did not recall any discussion of the DVRC Management Agreement.

To my mind, it seems likely that there was minimal discussion of the DVRC Management Agreement because the specific terms of the agreement did not matter to the issue before the WestCo Board. That issue was the policy question of whether DVRC should shift to the Management Company Structure. For purposes of that question, the specific details and history of the DVRC Management Agreement were of secondary importance. The effort to respond to the SEC inquiry had uncovered the DVRC Management Agreement, and the re-discovery of that agreement prompted Manheim and Mezzaroba to think that it would be easier to present DVRC to regulators, like the USCIS and SEC, if DVRC simply paid a management fee to a management company, but they did

not have to use the DVRC Management Agreement to implement a Management Company Structure. The DVRC Management Agreement was a cursory, one-sentence agreement, and Manheim had terminated it two years earlier. The more logical course was to put in place a new and more detailed agreement with a different management company.

The WestCo Board therefore did not delve into the details of the DVRC Management Agreement. As a consequence, the WestCo Board did not have full information about that agreement, its termination, or the significant differences between the circumstances when it was executed and the circumstances that prevailed in June 2017.

During the June 2017 Meeting, the WestCo Board did not make specific decisions about what entity would serve as the management company, what the management fee would be, or what services the fee would cover. The WestCo Board reached a consensus that DVRC should shift to the Management Company Structure. The WestCo Board also discussed whether ReathCo should serve as the management company, what services the fee relationship should cover, and whether to move salaries and other expenses from DVRC to ReathCo. But the WestCo Board did not make any decisions on those more specific topics. Ban strongly opposed having ReathCo serve as the management company. To the extent there was a shift to the Management Company Structure, which Ban generally supported, Ban wanted a new entity to serve in that role.

Because of Ban's opposition, the WestCo Board did not make any specific determinations. The WestCo Board reached a consensus that DVRC would move to a Management Company Structure, but it resolved to analyze the details further.

The minutes for the June 2017 Meeting reflect these determinations. On the ReathCo issue, the minutes state:

> Move all executives off of DVRC payroll to Reath & Company or new entity and payroll is created for Chloe Deon and Kareem Rosser. Compensation will be transferred for [Frank] and [Mezzaroba]. Further, Board will evaluate Reath & Company vs. new entity as appropriate vehicle for executives and executive operations going forward.

JX 482. The WestCo Board thus approved the Management Company Structure, but it did not make final determinations about what entity would serve as the management company or the services that it would provide. Instead, the Board resolved to "evaluate" using ReathCo or a new entity. The minutes do not reflect any consideration of a management fee beyond the approval of a 17-week cashflow budget that provided for specific payments to ReathCo. *See* JX 1740. The post-meeting communications also evidence that no decision was made. *See* JX 497; JX 506.

The decisions that the WestCo Board made during the June 2017 Meeting thus do not bear indicia of fairness. The WestCo Board lacked a disinterested and independent majority, and the directors did not have full information about the DVRC Management Agreement. Most significantly, the WestCo Board did not make a decision to pay ReathCo a management fee in accordance with the DVRC Management Agreement.

### c. The Payment Of Management Fees After The June 2017 Meeting

Finally, the payment of management fees after the June 2017 Meeting did not bear the hallmarks of fair dealing. The court has found that (i) Manheim terminated the DVRC Management Agreement in June 2015, and (ii) the WestCo Board reached a consensus

during the June 2017 Meeting about moving to a Management Company Structure, but did not determine any of the details. Under the circumstances, DVRC did not have authority to pay management fees to ReathCo. There should have been further deliberation by the WestCo Board and specific decisions on the open issues.

Instead, the transfers began. As discussed in the Factual Background, the transfers did not resemble a regular management fee, and there was no clear designation of a payment that constituted a management fee. Transfers went to ReathCo at varying times and in varying amounts. Ban questioned some of those transfers, and he expected there would be a true up once the WestCo Board decided on the details of the Management Fee Structure. *See* Ban Tr. 390, 394; JX 506.

Rather than resulting from a decision by the WestCo Board, the reactivation of the DVRC Management Agreement and the recharacterization of transfers to ReathCo as management fees happened when DVRC prepared its audited financial statements for 2017. During that process, two DVRC employees calculated the amounts that DVRC would have owed to ReathCo under the DVRC Management Agreement, including interest on past due amounts. They booked those amounts as liabilities in DVRC's financial statements. Then they recharacterized any transfers from DVRC to ReathCo as management fees. Those decisions did not result from a fair process. They were administrative exercises by DVRC employees.

**2.     The Management Fees: Fair Price**

The more difficult aspect of the entire fairness analysis is financial fairness. The evidence is mixed, with Manheim presenting expert testimony indicating that to the extent that the management fees were viewed as his compensation, then the level of compensation that he received fell within a broad range of financial fairness when compared to the compensation received by executives at private equity firms and by fund managers. The plaintiffs called into question the persuasiveness of those comparisons, and they attacked the level of Manheim's compensation in light of the agreements reached in connection with the Reorganization.

**a.     The Expert Testimony**

To establish the fairness of the management fees, Manheim relied on expert testimony from Irv Becker, Vice Chairman of the Executive Pay & Governance Practice of Korn Ferry.[25] Becker is an experienced compensation consultant who works with boards

---

[25] Manheim also cited his own employment history. He explained that he had worked in highly compensated positions, including as a bond trader at Salomon Brothers in London, as an investment banker at ING, as a fund manager for a New York hedge fund, and as the Chief Investment Officer at the Swarthmore Group. *See* Manheim Tr. 451–53. Manheim did not, however, provide any information about his compensation in these positions, except his testimony that during his first two years at the Swarthmore Group, he was paid $400,000 per year. *Id*. at 456–57. Manheim also testified that he received bonuses, but he did not identify the amount. *Id.* at 457. And ReathCo was paid $500,000 annually for acting as a family office for Manheim's wealthy friend. Ban Tr. 209; *see* Manheim Tr. 516.

Manheim's compensation history might have provided some support for the level of management fees that ReathCo received, but Manheim would have needed to provide additional details, including more specific compensation figures. He also would have

of directors and senior management in the design and development of compensation programs. *See* JX 1418 ¶¶ 1–5.

Becker testified that an AUM-based methodology is a reasonable and common form of executive compensation for asset management firms. Becker Tr. 1040. Becker opined that it creates a pay-for-performance structure that aligns DVRC's and Manheim's interests to grow DVRC's asset base and profitability. *Id.* That opinion addresses the structure of the management fee; it does not speak to the amount of the fee. Becker did not do any benchmarking to determine whether a management fee of 0.25% of AUM was reasonable. Becker Tr. 1056–57.[26]

Becker testified that Manheim's compensation fell within a range of fairness. To develop a range, Becker conducted his own competitive market assessment by examining the pay of executives that he regarded as performing roles similar to Manheim. JX 1418 ¶ 6; Becker Tr. 1039–40. No public information about EB-5 regional centers is available, so Becker looked at compensation levels for executives at private equity firms, investment

---

needed to provide additional insight into the advisory fees that ReathCo received from Manheim's wealthy friend and how they were calculated. As presented, Manheim's description of his compensation history is unpersuasive.

[26] The plaintiffs' industry expert, Sam Silverman, agreed that officer compensation for an EB-5 business could be tied to AUM. Silverman Tr. 898. That statement was not the strong endorsement that Manheim claims. Silverman agreed that it was possible to tie compensation to AUM, and he noted that executive compensation could be tied to other metrics as well. *See id.*

management firms, and investment advisory firms. He used information from three different sources. JX 1418 ¶¶ 15–33.

The first source was a database created by Economic Research Institute ("ERI"), which collects data through salary surveys and from public company filings. *Id.* ¶¶ 15–19. Using a proprietary regression, ERI created a formula that calculates an implied level of compensation for a particular position based on the level of AUM. Becker only had access to the formula for 2019. Becker Tr. 1043. To generate a compensation figure for 2019, Becker keyed in DVRC's AUM and selected the CEO position, then the ERI interface generated an implied level of compensation. *Id.* To generate compensation figures for the years 2015–2018, Becker discounted the 2019 figures by 5% per year. To generate data for 2020, he increased the 2019 figures by 5%. *Id.* Becker did not have access to ERI's underlying data or to the regression. *Id.* at 1044.

Becker's second source was Heidrick & Struggles, which conducts an annual survey of private equity compensation and aggregates the data to evaluate trends. Becker used the surveys from 2016 to 2019 to determine the compensation of the person in the managing partner position (the highest position) at a private equity firm with AUM similar to DVRC. Becker excluded carried interest compensation from the calculation. JX 1418 ¶¶ 27–33; Becker Tr. 1046–47. Becker again did not have access to data for 2020, so he used the figures for 2019 and increased them by 5%. Becker Tr. 1046.

Becker's third source consisted of surveys of compensation at financial services companies prepared by McLagan Data & Analytics ("McLagan"). Becker used the surveys

for private equity firms, asset management companies, and banks. JX 1418 ¶¶ 20–26. From the private equity survey, Becker generated a benchmark based on the compensation of a managing director of direct investments. The only available data was for funds with up to $5 billion in AUM, many times DVRC's size. From the asset management surveys, Becker developed a benchmark for the compensation of a senior portfolio manager in fixed-income investments. The only available data was for funds with up to $15 billion in AUM, many more times DVRC's size. Becker also used the asset management surveys to develop a benchmark for the compensation of a senior portfolio manager in municipal fixed-income investments, which included funds of all sizes. From the banking survey, Becker developed a benchmark for a managing director of municipal finance, where he again drew data from companies of all sizes. To attempt to account for the fact that the surveys included compensation data from much larger entities, Becker used data for the second highest executive position, rather than the highest position. Becker Tr. 1048–49.

Becker opined that a reasonable range of compensation would fall between the 10th percentile and the 90th percentile of peer companies. Using his data sources, Becker developed the following ranges of reasonable compensation:

| Year | Low End (10%) | High End (90%) |
|------|---------------|----------------|
| 2015 | $486,000 | $1,447,000 |
| 2016 | $498,000 | $1,308,000 |
| 2017 | $444,000 | $1,445,000 |
| 2018 | $491,000 | $1,788,000 |
| 2019 | $524,000 | $2,137,000 |
| 2020 | $550,000 | $2,224,000 |

JX 1418 ¶¶ 35–39; Becker Tr. 1049–52. Based on these ranges, Becker opined that reasonable compensation for the period from 2015 to 2020 for a role comparable to Manheim's would range from $2,940,000 to $10,369,000. *See* JX 1418 ¶ 40. Becker opined that Manheim's compensation of $5,652,406 fell within a reasonable range. Becker Tr. 1052–55.

The plaintiffs' rebuttal expert, David Denis, critiqued Becker's analysis. Denis explained that Becker simply looked at pay for comparable positions at comparable firms. Denis Tr. 1082. As with any analysis of this type, its persuasiveness depends on the strength of the comparisons.[27] Becker failed to establish persuasively that the positions were comparable, that the firms were comparable, or that the resulting range was informative.

In terms of firms, Becker failed to explain persuasively that private equity, investment management, and investment advisory firms were sufficiently comparable to

---

[27] *In re Cellular Tel. P'ship Litig.*, 2022 WL 698112, at *30 (Del. Ch. Mar. 9, 2022) ("The reliability of the comparable companies method thus depends in the first instance on having companies that are sufficiently comparable that their valuation ratios provide insight into the value of the subject company."); *In re Appraisal of Orchard Enters., Inc.*, 2012 WL 2923305, at *9 (Del. Ch. July 18, 2012) ("Reliance on a comparable companies or comparable transactions approach is improper where the purported 'comparables' involve significantly different products or services than the company whose appraisal is at issue, or vastly different multiples. At some point, the differences become so large that the use of the comparable company method becomes meaningless for valuation purposes." (cleaned up)); *In re Radiology Assocs., Inc. Litig.*, 611 A.2d 485, 490 (Del. Ch. 1991) ("The utility of the comparable company approach depends on the similarity between the company the court is valuing and the companies used for comparison.").

the EB-5 Business. The compensation received by fund executives correlates with the fund's investment strategy, investment risk, and rate of return. *See* Becker Tr. 1073–75; Denis Tr. 1084–85, 1088. DVRC, however, is not a traditional investment manager that seeks to generate above-market rates of return by following a particular investment strategy. DVRC's investors do not expect to receive even at-market returns, because they are motivated by the prospect of receiving green cards. *See* Denis Tr. 1084–85. DVRC's investments and fee structure demonstrate how distinctive it is. DVRC invests all of its capital by making loans to the PTC or SEPTA that bear interest at a rate of 2% per annum. DVRC retains 75% of the income that the funds generate. In addition, DVRC takes 0.25% of AUM as a management fee. DVRC thus receives around 87.5% of the returns from the funds' investments, with the fund investors receiving only 12.5%. Moreover, to receive that return, the funds' investors must pay a subscription fee equal to 10% of their principal. Denis calculated that the combination results in a rate of return of negative 1.41%. *Id.* at 1086. Becker did not consider the distinctions between the funds he examined and the EB-5 Business. *See* Becker Tr. 1070, 1073–74.

In terms of positions, Becker did not persuasively establish a comparable relationship between what Manheim does and what fund executives do. A fund manager in an actively managed fund engages in the process of buying and selling securities in an effort to deploy an investment strategy designed to generate an attractive rate of return. That effort requires complex due diligence and a series of investment decisions. In the case of private equity funds, the fund managers become actively involved in their portfolio

companies. In the EB-5 Business, each fund makes a single loan to a government agency which it holds to term. The differences between the EB-5 Business and other types of fund management businesses means that there are necessarily significant differences between the executive positions. *See* Denis Tr. 1088–90. Becker did not know if Manheim performed activities similar to fund managers and admitted that he was not qualified to make that determination. Becker Tr. 1069.

In terms of his ultimate range, Becker opined that a range of fairness ran from the 10th percentile to the 90th percentile. That range was expansively wide, and it did not take into account differences among firms that would be correlated with relevant criteria. *See* Denis Tr. 1091. The compensation range used to justify Manheim's total compensation also included 2015, before DVRC had AUM.

Denis and the plaintiffs offered still more critiques. Denis noted that because ERI uses an undisclosed, proprietary regression analysis, Becker could not confirm if the regression was reliable. Becker Tr. 1076. Denis pointed out that the benchmarks generated from the McLagan data either did not have any limitations on a firm's AUM or included firms with AUM much greater than DVRC, resulting in the inclusion of companies that were not comparable to DVRC. JX 1519 ¶ 66. Denis also observed that Becker did not take into account regional variations in compensation. The Heidrick & Struggles data showed that in 2018, managing partners in the mid-Atlantic region, where DVRC is located, earned 71% of what their counterparts in the Northeast earned. In 2019, that figure was 52%. *Id.* ¶ 69.

On balance, Denis called into question the persuasiveness of Becker's work. The persuasiveness of a study based on comparisons depends on how similar the comparisons are. Becker failed to establish that his comparisons were sufficiently persuasive, and Denis undermined them further.

### b. The Case-Specific Evidence

Rather than looking to survey evidence on third-party compensation, Denis opined that the fairness analysis must consider the understandings that Manheim, Ban, and Bamford reached in connection with the Reorganization. *See* Denis Tr. 1083–84. This court recently looked to parties' original agreement to evaluate the fairness of management fees that a fund manager subsequently charged. *See HOMF II Inv. Corp. v. Altenberg*, 2020 WL 2529806, at *45–48 (Del. Ch. May 19, 2020), *aff'd*, 263 A.3d 1013 (Del. 2021) (TABLE).

When the Reorganization took place, Manheim and Ban were receiving compensation of $300,000 in salary plus benefits. The Admission Agreement contemplated that after DVRC paid or made provision for its liabilities and expenses, including the compensation due to its officers, WestCo would distribute the available cash flow to the members of DVRC. Through that mechanism, Penfold would receive 90% of the distribution, and Manheim, Ban, and Bamford would receive equal shares of the 90%. No one said anything about the existence of a commitment by DVRC to pay a management fee to ReathCo equal to 0.25% of AUM.

The Admission Agreement memorialized those agreements through the Allocation Provision and the Distribution Provision. Through the Allocation Provision, Manheim,

Ban, and Bamford agreed that the officer compensation Manheim and Ban received would be treated as an expense of DVRC and not as a distribution of cash flow. JX 452 ¶ 4(b). In the Distribution Provision, Manheim, Ban, and Bamford agreed that WestCo "shall . . . distribute Available Cash Flow," defined as "the cash of the Company available after appropriate provision for expenses and liabilities, as determined by the Managing Member." *Id.*

These provisions did not prevent the WestCo Board from increasing the compensation paid to Manheim and Ban. The WestCo Board had the power to increase officer compensation. These provisions did not even prevent the WestCo Board from approving a management fee. The WestCo Board could cause DVRC to incur liabilities and expenses, including a management fee to a related party. For this reason, the plaintiffs do not possess a claim for breach of the Admission Agreement based on the payment of management fees to ReathCo.

The Admission Agreement did reflect an expectation that the WestCo Board would act openly through a formal increase in officer compensation, rather than through other means. As this decision has discussed, Manheim, Ban, and Bamford agreed to the Reorganization in an effort to allocate cash flows transparently and fairly. They did not contemplate a management agreement under which DVRC committed to pay approximately 14% of its revenue to Manheim, above the level of compensation that the WestCo Board approved for him to receive.

This evidence supports a finding that the full amount of the management fees paid to ReathCo was not entirely fair. At the same time, the evidence does not suggest that any amount paid in management fees over $300,000 was unfair. Ban himself acknowledged that some of the transfers to DVRC were proper and he did not object to their payment. *See, e.g.*, Ban Tr. 390, 394; JX 506.

### 3. The Finding Regarding Fairness

Viewing the evidence holistically, Manheim failed to carry his burden of showing that the management fees paid to ReathCo were entirely fair. The evidence on fair dealing favors the plaintiffs. The evidence on fair price is mixed. Manheim offered an expert opinion from a compensation expert, but the plaintiffs successfully undermined his testimony. The case-specific evidence indicates that the full amount of the management fee that Manheim extracted was not entirely fair.

Manheim therefore failed to prove that it was entirely fair for ReathCo to receive excess management fees in the amount of $3,552,406. As discussed below, however, the court will not award the full amount as a remedy.

## D. Transfers To Frank, Mezzaroba, And Mandle

The plaintiffs also challenge $3,047,651.69 in transfers from DVRC to Frank, Mezzaroba, and Mandle between 2018 and 2020. These transfers consist of compensation and benefits paid to Frank, Mezzaroba, and Mandle.

### a. Frank's Compensation

The plaintiffs challenge Frank's compensation of $1,415,918.48. That total consists of:

- Salary of $150,000 per year from May 2017 until November 2018. JX 466.

- Salary of $300,000 per year from November 2018 through the end of 2020. JXs 1017–18.

- A bonus of $150,000 in 2020. *See* JX 1309; Mezzaroba Tr. 802.

- Car reimbursement in 2018 and 2019 in the amount of $38,594.98. JX 1517 at '076.

- Gym expenses in 2019 in the amount of $9,087.50. *Id.* at '077.

At post-trial argument, the plaintiffs conceded that Frank was entitled to compensation of $150,000 per year. Given that concession, Frank was entitled to at least $600,000 in compensation. The debate is over the remaining $815,918.48.

"Self-interested compensation decisions made without independent protections are subject to the same entire fairness review as any other interested transaction." *Valeant Pharm. Int'l v. Jerney*, 921 A.2d 732, 745 (Del. Ch. 2007). When a compensation decision is not plainly self-interested, however, a plaintiff must make a *prima facie* showing that the person making the compensation decision faced a conflict of interest. *Avande, Inc. v. Evans*, 2019 WL 3800168, at *14 (Del. Ch. Aug. 13, 2019). For purposes of Frank's compensation, the plaintiffs made the necessary showing. Family ties raise doubts about a fiduciary's independence. *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 823 (Del. Ch. 2005), *aff'd*, 906 A.2d 766 (Del. 2006). As Frank's brother, Manheim could not make an independent decision regarding Frank's compensation. He therefore had the burden of proving that Frank's compensation was entirely fair. *See CanCan Dev., LLC v. Manno*, 2015 WL 3400789, at *17 (Del. Ch. May 27, 2015) ("The amounts Manno paid Joey and Patty are subject to entire fairness review."), *aff'd*, 132 A.3d 750 (Del. 2016).

98

Manheim carried his burden of demonstrating that Frank's compensation was entirely fair, notwithstanding defects from the standpoint of fair process. In November 2018, when the Board increased Frank's salary to $300,000, the only two directors who voted were Manheim and Mandle. JX 1018. Regardless of how one views Mandle, the WestCo Board that approved Frank's compensation lacked an independent and disinterested majority of directors.

The Board's process for approving a $150,000 bonus for Frank in 2020 was worse. Manheim, Frank, Mezzaroba, and Mandle voted to approve "discretionary bonuses in the aggregate amount of $375,000.000 for Board members Paula Mandle, Albert Mezzaroba, and Frank Manheim for their work in 2019." JX 1309. The resolution authorized Manheim to allocate the bonus pool. *Id.* Frank, Mezzaroba, and Mandle thus voted in favor of their own compensation in what was an obviously self-interested transaction.

Nevertheless, the fair price dimension of the entire fairness analysis carries the day. Frank's compensation increased from $150,000 to $300,000 because Frank took over Ban's duties after Ban left DVRC. Ban was paid $300,000 per year. It makes sense that Frank would receive similar compensation for similar work.

Manheim also proved that reimbursing Frank for his car and gym expenses was fair. DVRC had similarly covered Ban's car and gym expenses during his employment. JX 1517 at '078–80; Ban Tr. 262, 282, 400–04. The amounts paid to Frank do not seem excessive.

A compensation study that the Board commissioned in 2020 provides some additional evidence that Frank's compensation was fair. The Board retained HResults, Inc.,

99

a compensation consultant, to perform the study. HResults used two data sets to benchmark the compensation paid for the COO role at comparable firms. JX 1544. In one data set, HResults drew on published compensation surveys to obtain compensation information for firms with $500–$650 million AUM that were involved in "investing/harvesting assets" and "mezzanine/institutional/fund of funds." *Id.* at 2. HResults determined that $605,000 was the mean for the total cash compensation for a COO in 2020. *Id.* at 5. In the other data set, HResults drew on proprietary surveys and determined that at the 50th percentile, comparable firms paid $672,000 in salary and bonus for a COO. *Id.* at 13.

The HResults study is vulnerable to many of the same criticisms that undermined Becker's testimony in this case. Nevertheless, it provides an indication, and Frank's compensation is well below the figures in the study. That was even true in 2019 when Frank's total compensation reached its height of $478,286.77, consisting of a salary of $300,000, a bonus of $150,000, car reimbursements of $19,199.27, and gym expenses of $9,087.50. *See* Mezzaroba Tr. 802; JX 1517 at '076–77.

Manheim proved Frank's total compensation was fair.

### b. Mezzaroba's Compensation

The plaintiffs challenge Mezzaroba's compensation of $1,189,527.39. That total consists of:

- Salary of $150,000 per year from May 2017 until November 2018. JX 466.

- Salary of $300,000 per year from November 2018 through the end of 2020. JXs 1017–18.

- A bonus of $150,000 in 2020. *See* JX 1309; Mezzaroba Tr. 802.

- Car reimbursement in 2018 and 2019 in the amount of $14,527.39. JX 1517 at '075.

Like Frank, Mezzaroba was entitled to at least $150,000 per year, which is the amount that Ban and Bamford approved in May 2017. JX 466. Mezzaroba was therefore entitled to at least $600,000 in compensation.

The plaintiffs did not make a *prima facie* showing that Mezzaroba's compensation was an interested transaction that would necessitate Manheim proving its fairness. *See Avande*, 2019 WL 3800168, at *14. Unlike Frank, Mezzaroba did not have a family relationship with Manheim. Manheim and Mezzaroba are longtime friends, but the plaintiffs did not show that the relationship was sufficiently close to compromise Manheim's independence. The Manheim-Mezzaroba relationship was asymmetrical. Mezzaroba was not able to make independent decisions regarding transfers to Manheim because of the combination of his employment relationship, their friendship, and Manheim's status as a controller. The compromising connections do not run the other way.

The plaintiffs argue that Manheim paid Mezzaroba an excessive amount so that Mezzaroba would bless Manheim's self-interested transfers. Mezzaroba's compensation is not so excessive as to support an inference to that effect. Mezzaroba's compensation rather appears reasonable given his skills and qualifications. Mezzaroba is an experienced lawyer and executive who is well connected in state government and has important relationships with SEPTA and the PTC. He clearly provides considerable value to DVRC.

Because Mezzaroba's compensation was not an interested transaction, Manheim did not have to prove that Mezzaroba's compensation was entirely fair. Assuming for purposes

of analysis that Manheim bore that burden, Manheim proved that Mezzaroba's total compensation was fair.

### c.     Mandle's Compensation

Finally, the plaintiffs challenge Mandle's compensation of $442,205.82. That total consists of:

- Salary of $150,000 per year from September 2018 until December 2020. JX 998.

- A bonus of $75,000 in 2020. *See* JX 1309; Mandle Tr. 735.

- A travel stipend of up to $18,000 per year from 2018–2020. Mandle Tr. 736–38

Given Mandle's astounding testimony at trial, the plaintiffs proved that Manheim breached his fiduciary duties by providing Mandle with this level of compensation, which Manheim failed to prove was entirely fair.

Once again, to invoke entire fairness review, the plaintiffs had the burden to make a *prima facie* showing that Manheim faced a conflict of interest when determining Mandle's compensation. *See Avande*, 2019 WL 3800168, at *14. Mandle is an outside director. She has known Manheim since his days at the Swarthmore Group, she was one of the original directors and officers of WestCo, and she received shares when WestCo was created that she still owns today. Mandle then left the WestCo Board in 2012 after Ban acquired half of her shares. *See* JX 28; JX 49. Manheim reappointed her to the WestCo Board in September 2018, after the disputes arose with Bamford and Ban. *See* JX 998. Those ties are not sufficient to raise meaningful questions about Manheim's independence from Mandle or his ability to set her compensation, so the business judgment rule applies as the default standard of review.

102

When the business judgment rule applies, the court will not second guess the decision unless it is so extreme that it constitutes waste. The plaintiffs disavowed making a claim for waste. They instead argued that Mandle's compensation was so extreme as to support an inference that Manheim paid Mandle as a *quid pro quo* for her to support his self-dealing.

At first blush, it is difficult to find conceptual daylight between these theories. Contemporary Delaware decisions have brought waste within the fiduciary framework of the business judgment rule by re-conceiving waste as a means of pleading that a fiduciary acted in bad faith.[28] A court may find that a fiduciary acted in bad faith "where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the [entity]."[29] "The waste test is one way of establishing irrational, bad faith conduct."

---

[28] *See, e.g.*, *White v. Panic*, 783 A.2d 543, 554 n.36 (Del. 2001) ("To prevail on a waste claim or a bad faith claim, the plaintiff must overcome the general presumption of good faith by showing that the board's decision was so egregious or irrational that it could not have been based on a valid assessment of the corporation's best interests."); *In re Books-A-Million, Inc. S'holders Litig.*, 2016 WL 5874974, at *8 (Del. Ch. Oct. 10, 2016) ("When the business judgment rule provides the operative standard of review, then a court will not consider the substance of the transaction unless its terms are so extreme as to constitute waste and thereby support an inference of subjective bad faith."), *aff'd*, 164 A.3d 56 (Del. 2017) (TABLE); *CanCan*, 2015 WL 3400789, at *20 (explaining that waste is "best understood as one means of establishing a breach of the duty of loyalty's subsidiary element of good faith"); *Se. Penn. Transp. Auth. v. AbbVie Inc.*, 2015 WL 1753033, at *14 n.144 (Del. Ch. Apr. 15, 2015) ("This Court has found that, doctrinally, waste is a subset of good faith under the umbrella of the duty of loyalty."), *aff'd*, 132 A.3d 1 (Del. 2016) (TABLE).

[29] *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 67 (Del. 2006); *accord Stone ex rel. AmSouth Bancorp. v. Ritter*, 911 A.2d 362, 369 (Del. 2006); *see Gagliardi v. TriFoods*

*CanCan*, 2015 WL 3400789, at \*21. A wasteful transaction is so extreme "as to create an inference that no person acting in a good faith pursuit of the corporation's interests could have approved the terms." *Sample v. Morgan*, 914 A.2d 647, 670 (Del. Ch. 2007).

The plaintiffs perceive a distinction between challenging a transaction solely on the basis of waste (i.e., because its terms are so extreme and nothing more) versus challenging a transaction as part of a larger breach of duty (i.e., because it is both extreme and inferably part of an illicit and symbiotic *quid pro quo*). They maintain that they have disavowed the former claim and asserted the latter claim.

The big picture always matters whenever this court considers a claim of fiduciary misconduct. A scenario in which one fiduciary appears to be facilitating breaches of duty by another fiduciary is qualitatively different than a scenario in which the plaintiff claims only that the terms of the transaction are egregiously or irrationally unfair. By disavowing a waste claim, the plaintiffs did not forsake their ability to argue that Mandle's compensation is sufficiently extreme, taking into account her responsibilities and knowledge, to support a finding that it constitutes an illicit and symbiotic *quid pro quo*.

---

*Int'l, Inc.*, 683 A.2d 1049, 1051 n.2 (Del. Ch. 1996) (defining a "bad faith" transaction as one "that is authorized for some purpose other than a genuine attempt to advance corporate welfare or is known to constitute a violation of applicable positive law"); *In re RJR Nabisco, Inc. S'holders Litig.*, 1989 WL 7036, at \*15 (Del. Ch. Jan. 31, 1989) (explaining that the business judgment rule would not protect "a fiduciary who could be shown to have caused a transaction to be effectuated (even one in which he had no financial interest) for a reason unrelated to a pursuit of the corporation's best interests").

Through her testimony at trial, Mandle portrayed herself as an individual so devoid of knowledge about DVRC and the EB-5 Business that her compensation would qualify as corporate waste. Mandle's testimony bordered on the farcical, to the point where the court must infer that Manheim pays her for reasons unrelated to her ability to act as a member of the WestCo Board and an officer of DVRC. Given Mandle's testimony, Manheim must be paying her to act as a rubber stamp for the self-interested decisions that he makes.

Mandle claimed to have an astounding lack of knowledge about WestCo, DVRC, and her roles. She was able to testify that she and Manheim are friends and that she rejoined the WestCo Board at Manheim's request. Mandle Tr. 722, 733. Other than that, Mandle claimed to know nothing:

- She did not know how much of the member interest in DVRC was owned by WestCo. Mandle Tr. 727–29.[30]

- Besides WestCo, she did not know who DVRC's other owners were. *Id.*[31]

- She had "heard of" Penfold but had "no understanding" of what it was. *Id.* at 729.[32]

- She knew there was a general manager for DVRC, but she had no specific knowledge of the general manager and believed it was Manheim. *Id.* at 728.[33]

---

[30] WestCo owns 10% of DVRC.

[31] DVRC has only one other owner—Penfold.

[32] Penfold is the only other owner of DVRC. It holds 90% of DVRC's member interests.

[33] WestCo is the managing member of DVRC. ReathCo is paid a management fee to act as the managing agent for DVRC.

- She had "no specific knowledge" of the business ReathCo was in. *Id.* at 730.[34]

- The only knowledge she had of ReathCo was of "its existence." *Id.*[35]

- She did not know if ReathCo provides any services to DVRC. *Id.* at 730–31.[36]

- When asked if she was aware of any management fee paid by DVRC to ReathCo, she said she was "aware that there is a management fee," but she did not know how much it is. *Id.* at 731.[37]

- She was not familiar with any loans between DVRC and WestCo. *Id.* at 733.[38]

- When asked if she was an officer of DVRC, she said, "I do not believe so, no." Mandle Tr. 728.[39]

---

[34] ReathCo is in the business of managing DVRC. ReathCo receives a management fee to fulfill that role.

[35] Between 2017 and 2020, ReathCo received $5,652,406 in management fees from DVRC. According to the defendants, ReathCo was and remains entitled to an on-going management fee equal to 0.25% of DVRC's AUM. Mandle claimed not to know anything about the recipient of those fees.

[36] To reiterate, between 2017 and 2020, ReathCo received $5,652,406 in management fees from DVRC, and the defendants claim that ReathCo was and remains entitled to an on-going management fee equal to 0.25% of DVRC's AUM. Mandle claimed not to know of any services that ReathCo provided in return for those fees.

[37] For a third time, between 2017 and 2020, ReathCo received $5,652,406 in management fees from DVRC. According to the defendants, ReathCo was and remains entitled to an on-going management fee equal to 0.25% of DVRC's AUM. As this decision has discussed, the management fee equates to 14% of DVRC's topline revenue. It is one of DVRC's largest expenses.

[38] Between 2014 and 2019, WestCo extended informal loans to ReathCo in the amount of $1,614,670. A loan agreement dated August 10, 2018, documented an additional loan from DVRC to WestCo in the amount of $1,798,332.17. JX 930.

[39] Mandle is both Chief Compliance Officer and a vice president.

106

- After being shown a document that identified her as DVRC's Chief Compliance Officer, she acknowledged that the document said that, but she was not sure that she held that title and could not describe any work she did in that capacity. *Id.* at 734. During her deposition, she stated that the Chief Compliance Officer role did not need to be active. Mandle Dep. 137.

- She agreed that she approves the wire transfers that DVRC uses to pay its expenses. Mandle Tr. 731–32. She could not recall approving wire transfers to ReathCo in the amount of $115,000 per month during 2019. *Id.* at 732.

- She had never done anything to determine whether any wire transfers sent to ReathCo were correct. *Id.*

- When asked about spending time at DVRC's offices, she testified that she went there "socially" at a frequency of "most likely every other week." *Id.* at 734–35.

She did know that she received a salary of $150,000 and a bonus of $75,000 in 2020. Mandle Tr. 734–35.

Mandle's testimony paints a stunning picture. She showed up at DVRC about once "every other week," where she has no recollection of doing much of anything. She approved transfers, but she did not know what they were for or why. She thought of her appearances as social visits. Based on her salary of $150,000 per year, she was paid about $5,769 per visit in 2018 and 2019. Adding in her bonus in 2020, she received about $8,654 for each visit in that year. She has no meaningful knowledge of DVRC, its governance structure, or its significant obligations.

It is hard to believe that Mandle actually knows so little about DVRC. Mandle seems to have had a successful career as one of the principals of the Swarthmore Group, where she served as its CEO. Having considered her testimony and demeanor, it seems likely that she played dumb and pretended not to know anything about DVRC because she thought

107

that would be helpful to the defendants and to herself for purposes this litigation. But that behavior itself provides powerful evidence of an illicit and symbiotic relationship between Mandle and Manheim. He pays her to serve his interests in the boardroom, and she continued to play that role on the witness stand. In return, she cashes her checks and ignores her duties.

The plaintiffs proved that Manheim paid Mandle to be his stooge. The payments to Mandle therefore constituted a breach of duty, and Manheim had the burden to prove that they were entirely fair to DVRC. Given Mandle's testimony, that was an impossible task. Manheim is liable for those payments.

## E.    Miscellaneous Expenses

The plaintiffs have challenged a long list of other expenditures. The plaintiffs bore the burden of establishing a *prima facie* case that the expenditures were self-interested. They failed for many of the expenditures. This decision only addresses the expenditures where they succeeded in making a *prima facie* case. As to those expenditures, Manheim failed to establish a proper business purpose for the expenses or to prove that it was entirely fair for DVRC to bear them.

The first two expenses involve transfers to Work to Ride, a charity co-founded by Manheim. In 2014, DVRC donated a horse trailer to Work to Ride that was valued at $1,000. JX 1517 at '062. Any challenge to that expense is barred by laches. *See*, *supra*, Part II.A.2. In 2018, DVRC made a contribution of $50,000 to Work to Ride. JX 1517 at

108

'070. Manheim made no effort to demonstrate that the donation had a legitimate business purpose. Nor did he show that the donation was entirely fair to DVRC.

In July 2016, Manheim submitted an expense report to DVRC on behalf of WestCo seeking reimbursement of $66,186.89 in expenses. *See id.* at '069. The report identified the following amounts, each of which was marked "personal" or "ReathCo."

- A political donation in the amount of $10,000.

- Stays at the Connaught Hotel totaling $24,991.20.

- Airfare totaling $16,936.22.

- A charge at the George Club for $796.79.

- Office furniture and expenses totaling $13,462.68.

*Id.*; JX 282. Manheim failed to prove that these expenses had a legitimate business purpose or were entirely fair to DVRC.

Over multiple years, charges totaling $3,928 were incurred at Delilah's Gentleman's Club. Of this amount, challenges to charges totaling $3,195 are barred by laches. *See* JX 1517 at '064. The remaining $733 was charged on a card in Manheim's name. *See id.* at '064–65. Manheim failed to prove that these expenses had a legitimate business purpose or were entirely fair to DVRC.

In 2019, DVRC paid $30,480.51 in medical expenses for Manheim after a skiing accident. *Id.* at '071. Manheim testified that he thought that DVRC had submitted these expenses to the health insurer for reimbursement but did not provide documentation showing that the insurer had reimbursed the expenses. *See* Manheim Dep. 384. There may have been a business purpose in having DVRC advance the expenses necessary to protect

109

the health of its CEO in the immediate aftermath of his accident, but Manheim accepted the medical expenses were amounts that he, and not DVRC, should bear. Manheim did not prove that DVRC had been reimbursed for the expenses. Manheim is therefore liable for those amounts.

## F. The Remedy

In light of the foregoing findings and rulings, Manheim failed to establish that the following amounts were entirely fair:

| Category | Amount |
|---|---|
| Excess Management Fees | $3,552,406.00 |
| Compensation to Mandle | $442,205.82 |
| Improper Expenses | $147,400.40 |
| Total | $4,142,012.22 |

The presumptively proper remedy is to award damages to DVRC in the amount of $4,142,012.22. Ban endorses that form of relief, but he also seeks other remedies. Bamford wants an investor-level damages award in addition to other remedies.

This court has broad authority to craft relief suited to the specific facts and equities of the case.[40] The "protean power of equity" allows a court to "fashion appropriate relief," and a court "will, in shaping appropriate relief, not be limited by the relief requested by plaintiff." *Tex. Instruments Inc. v. Tandy Corp.*, 1992 WL 103772, at *6 (Del. Ch. May 12,

---

[40] *See Gotham P'rs*, 817 A.2d at 176 ("[T]he Court of Chancery's powers are complete to fashion any form of equitable and monetary relief as may be appropriate." (cleaned up)); *Hanby v. Wereschak*, 207 A.2d 369, 370 (Del. 1965) ("[T]he Court of Chancery [has] . . . the inherent powers of equity to adapt its relief to the particular rights and liabilities of each party . . . .").

110

1992) (Allen, C.). "When equity takes jurisdiction of a cause and decides that relief shall be granted, the relief, including damages, if any, will be tailored to suit the situation as it exists on the date the relief is granted and the choice of relief is largely a matter of discretion with the trial judge." *Guarantee Bank v. Magness Constr. Co.*, 462 A.2d 405, 409 (Del. 1983) (holding that the Court of Chancery did not err in awarding a remedy that diverged from the parties' stipulated facts).

> Fundamentally, once a right to relief in Chancery has been determined to exist, the powers of the Court are broad and the means flexible to shape and adjust the precise relief to be granted so as to enforce particular rights and liabilities legitimately connected with the subject matter of the action. It is necessary for the Court to adapt the relief granted to the requirements of the case so as to give to the parties that to which they are entitled.

*Wilmont Homes, Inc. v. Weiler*, 202 A.2d 576, 580 (Del. 1964) (citation omitted). "The choice of relief to be accorded a prevailing plaintiff in equity is largely a matter of discretion with the Chancellor, and Delaware, with its long history of common law equity jurisprudence, has followed that tradition." *Lynch v. Vickers Energy Corp.*, 429 A.2d 497, 500 (Del. 1981) (citation omitted), *overruled on other grounds*, *Weinberger*, 457 A.2d 701.

> Unlike its extinct English ancestor, the High Court of Chancery of Great Britain, Delaware's Court of Chancery has never become so bound by procedural technicalities and restrictive legal doctrines that it has failed the fundamental purpose of an equity court—to provide relief suited to the circumstances when no other remedy is available at law.

William T. Quillen & Michael Hanrahan, *A Short History of the Delaware Court of Chancery: 1792–1992*, *in* Court of Chancery of the State of Delaware: 1792–1992, at 21, 22 (1992).

111

In one respect, the court departs from the presumptively proper remedy. Manheim failed to prove that the $3,522,406 in excess management fees was entirely fair. At the same time, Manheim's evidence demonstrated that $300,000 in salary was a low level of compensation for his position. Manheim had been receiving $300,000 per year in salary since his original agreement with Ban in 2014. The WestCo Board certainly could have increased Manheim's compensation openly by some amount and demonstrated that the increased compensation was entirely fair.

The parties have taken diametrically opposing positions about what the court should do in this situation. The plaintiffs want Manheim to be liable for the full amount of the management fees. Manheim contends that the plaintiffs were obligated to prove what a fair amount of compensation would have been, with Manheim only liable for the excess. Manheim contends that because the plaintiffs did not seek to prove a fair amount of compensation, he gets to keep the whole amount.

Each side has valid conceptual reasons for its position. By making the fiduciary disgorge the full measure of the unfair payment, the plaintiffs' approach discourages self-dealing and promotes good governance. The plaintiffs' approach also recognizes that Manheim bore the burden of proof on the issue of fairness. Manheim responds that a remedy of full disgorgement is unfair to him, precisely because his services were worth more to DVRC. A full disgorgement remedy therefore would confer a windfall on DVRC. Manheim contends that the plaintiffs must prove their damages, rather than simply receiving disgorgement.

112

Delaware law generally supports the plaintiffs' positions. *See Metro Storage Int'l LLC v. Harron*, — A.3d —, 2022 WL 1404359, at \*35–36 (Del. Ch. May 4, 2022) (collecting authorities). That said, the court is not obligated to award full disgorgement. The court can award what it regards as a fair remedy. *See In re Happy Child World, Inc.*, 2020 WL 5793156, at \*13 (Del. Ch. Sept. 29, 2020).

The court is convinced that it would be unfair on the facts of this case to require Manheim to disgorge of all of the management fees in excess of $300,000 per year. As noted, the evidence on fairness was mixed. To resolve the case, the court has had to resolve difficult factual questions, and while the court has made its findings based on what a preponderance of the evidence showed, the court acknowledges the existence of contrary evidence.

This is also not a case where Ban and Bamford acted blamelessly. Ban played a major role in creating the hot mess of the Company's historical records. Bamford should have paid more attention. And when it came time to sue, Ban and Bamford could and should have been more precise in their challenges. Ban and Bamford each advanced wide-ranging arguments and theories, several of which turned out to lack factual support.

The critical question is whether the court has a factual basis to craft a fair remedy that falls in between the parties' all-or-nothing poles. The DVRC Management Agreement provides an evidentiary hook. Although Manheim relied on the DVRC Management Agreement to support the propriety of ReathCo receiving a management fee equal to 0.25% of AUM, the reality is that when that agreement was executed, Manheim had agreed to

113

share the economic returns from the EB-5 Business equally with Ban. What the DVRC Management Agreement actually called for, therefore, was for Manheim to receive compensation equal to 0.125% of AUM.

At that level, Manheim would have received $1,776,203 in management fees, in addition to his salary of $2,100,000 from 2014 to 2020, for total compensation of $3,876,203. DVRC did not have AUM until 2016, so for the five years from 2016 to 2020, Manheim would have received additional compensation averaging $355,241 per year. Added to his salary of $300,000 per year, Manheim would have received total compensation of $655,241 per year. Compensation at that level brings Manheim above the low-end of the (flawed) range of fairness that his compensation expert presented.

In the exercise of the court's remedial discretion, the court only will hold Manheim liable for half of the excess management fees, or $1,776,203. Put conversely, the court finds that it would have been entirely fair for Manheim to receive total compensation of $3,876,203. Manheim is liable to DVRC for the full amounts of the other categories of transfers.

### 1. Damages Based On DVRC's Overall Level Of Expenses

Going beyond the specific transactions that this decision has addressed, the plaintiffs seek an award of damages on the theory that DVRC's overall expenses were too high. To support this remedy, the plaintiffs' damages expert calculated the difference between DVRC's reported expenses and what the plaintiffs' expert on the EB-5 industry, Silverman, opined was a reasonable level of expense for a comparable firm. Using that

calculation, the plaintiffs sought total damages of $13,734,744, which they label "Scenario B Damages." As a practical matter, this approach sought to recover all of DVRC's expenditures to the extent they exceeded the *pro forma* figure that Silverman opined was reasonable.

When seeking Scenario B Damages, the plaintiffs did not attempt to isolate individual instances of self-dealing. They instead argued that Manheim's obligations as a fiduciary required that he justify the firm's expenses. They claimed that Manheim must be held liable for any expenses that he did not justify.

Under Delaware law,

> fiduciaries have a duty to account to their beneficiaries for their disposition of all assets that they manage in a fiduciary capacity. That duty carries with it the burden of proving that the disposition was proper. . . . [I]ncluded within the duty to account is a duty to maintain records that will discharge the fiduciaries' burden, and . . . if that duty is not observed, every presumption will be made against the fiduciaries.

*Technicorp Int'l II, Inc. v. Johnston*, 2000 WL 713750, at \*2 (Del. Ch. May 31, 2000). "If corporate fiduciaries divert corporate assets to themselves for non-corporate purposes, they are liable for the amounts wrongfully diverted." *Id*. at \*45.

This legal principle, however, does not make a fiduciary strictly liable for every insufficiently documented expense. "[T]he mere fact that an expense is unsubstantiated is not grounds for finding a fiduciary breach." *Happy Child*, 2020 WL 5793156, at \*15. Before a fiduciary must demonstrate the fairness of an expenditure, the plaintiff must make a *prima facie* showing that the expenditures in question constituted a breach of fiduciary duty, typically because it constituted a self-interested transfer. *Avande*, 2019 WL 3800168,

115

at *14. Alternatively, if there is substantial evidence that a fiduciary engaged in widespread self-dealing through the reimbursement of expenses, then a court may hold the fiduciary to account for a broader range of transactions. *Dweck v. Nasser*, 2012 WL 161590, at *19 (Del. Ch. Jan. 18, 2012) (holding fiduciary liable for "$171,966 of admittedly personal expenses and the $170,400 of indeterminate expenses" but not for $124,582 in expenses that the fiduciary testified were legitimate).

The plaintiffs did not make a *prima facie* showing that the thousands of individual expenditures covered by the Series B Damages scenario, incurred by DVRC over more than six years, constituted self-interested transfers or otherwise supported a *prima facie* case for breach of fiduciary duty. The plaintiffs did not even demonstrate that all of the expenses can be attributed to Manheim. Before his suspension and subsequent termination, Ban had the authority to incur expenses for DVRC. He had a DVRC credit card, and he charged many expenses to that account. *See, e.g.*, JX 596 (American Express transaction summary where 1,245 transactions of 1,400 were made on a company card in Ban's name). Ban used DVRC funds to pay for things like his apartment, car, bar review course, martial arts classes, and massages. *See* JX 1517 at '078–80; Ban Tr. 262, 282, 400–04. Some of the transactions benefited Bamford. For example, DVRC paid for Bamford to have an apartment in Philadelphia. *See* JX 331; Bamford Tr. 109.

In an attempt to avoid the consequences of failing to make a *prima facie* showing, the plaintiffs argue that their damages expert "didn't feel like he had sufficient information to opine definitively about the business purposes of DVRC's expense reimbursements,

116

lacking underlying supporting documentation." Dkt. 357 at 51–52 (cleaned up). The plaintiffs had the ability to conduct broad discovery, and they obtained documents and testimony from the defendants' auditors and accountants. *See* Dkt. 176; Dkts. 181–82. The plaintiffs did not make a sufficient showing to call into question DVRC's general level of expenses. The court will not award additional damages on that basis.

2.    **An Accounting For Expenses Incurred On Or After January 1, 2020**

As an additional remedy, the plaintiffs seek an accounting to identify expenses that Manheim incurred after January 1, 2020. The plaintiffs did not show a sufficient need for an accounting.

The plaintiffs' forensic expert received "financial information pertaining to the year ended December 31, 2020 for DVRC, the DVRC EB-5 Funds, and Penfold, including bank statements, payroll journal reports, contractor payment reports, employee expense reports, monthly credit card statements, deposit confirmation reports, and cash card statements." JX 1530 at '004. The only financial records that the plaintiffs claim their expert was missing were DVRC's audited financial statements and its 2020 tax returns. The documentation that the expert received should have been enough to allow the plaintiffs to challenge any supposedly improper expenses in 2020.

The plaintiffs did not receive any information about subsequent time periods, raising the possibility of an accounting for 2021. If the plaintiffs had shown that Manheim engaged in a widespread practice of causing DVRC to pay improper expenses, then an accounting might be warranted. *See, e.g.*, *Carlson v. Hallinan*, 925 A.2d 506, 537 (Del. Ch. 2006);

117

*Technicorp*, 2000 WL 713750, at *2. During DVRC's early days, its bookkeeping was poor, and Manheim and Ban were using DVRC to cover personal expenses to generate tax benefits. Had those practices continued, then an accounting might well be appropriate. Since the SEC inquiry, however, DVRC has cleaned up its act.

The plaintiffs can use their informational rights to obtain financial statements and basic entity-related documents. They also can obtain information about any related-party transfers involving Manheim, the members of the WestCo Board, or DVRC's senior officers. *See Woods Tr. of Avery L. Woods Tr. v. Sahara Enters., Inc.*, 238 A.3d 879, 900–02 (Del. Ch. 2020). If they have a proper purpose that would support further digging, such as a credible basis to explore potential wrongdoing, then they can obtain additional documents. The court will not require an accounting as part of the remedy in this case.

### 3.    An Investor-Level Remedy

Bamford argues that to the extent the court holds Manheim liable for diverting amounts from DVRC, then the court should award an investor-level remedy rather than a corporate-level remedy. A court has the power to award an investor-level remedy in a derivative action, but this case does not warrant it.

"The recovery in a derivative action generally goes to the injured entity, but that rule is not absolute." *Goldstein v. Denner*, 2022 WL 1797224, at *15 (Del. Ch. June 2, 2022) (footnote omitted) (collecting authorities). The rule that calls for the investor to sue derivatively in the corporation's name and for the corporation to receive the recovery "must always yield to the requirements of equity, and is cast aside in view of the fact that the

118

stockholders are the real beneficiaries whenever the usual course is not open." *Home Fire*

*Ins. Co. v. Barber*, 93 N.W. 1024, 1033 (Neb. 1903) (Pound, C.).

Courts have awarded investor-level remedies when the defendants were insiders who misappropriated entity property, such that an entity-level recovery would return the property to the wrongdoers' control. *See Goldstein*, 2022 WL 179224, at \*17 (collecting authorities). Courts likewise have crafted an investor-level recovery when the entity-level recovery would enable the "guilty" to benefit, but an investor-level recovery could be tailored to benefit only the "innocent" stockholders. *Id.* (collecting authorities). Courts have been most willing to award an investor-level remedy when the entity is no longer an independent going concern, such that channeling the recovery through the entity is no longer feasible or a *pro rata* recovery is more efficient. *Id.* (collecting authorities). Courts are less willing to consider an investor-level remedy if it would prejudice the rights of parties having a higher priority in the capital structure, such as creditors. *Id.* (collecting authorities).

This case exhibits two of the traditional factors that could support an investor-level remedy. Manheim, the self-dealing fiduciary, continues to control DVRC, so an entity-level recovery would return the wrongfully taken funds to Manheim's control. For similar reasons, an entity-level recovery would benefit Manheim, while an investor-level recovery could be tailored specifically for Bamford and Ban.

The traditional factor that does not apply is that DVRC remains a going concern. DVRC has not dissolved or merged into another entity, so channeling the recovery through the entity remains both possible and efficient.

A factor that could point to an investor-level remedy is the Distribution Provision, which requires that DVRC distribute its available free cash flow to its members. By causing DVRC to make the challenged transfers, Manheim demonstrated that the funds were not required to pay creditors or as reserves for potential liabilities. The amounts of those transfers would have been part of DVRC's available cash flow, and WestCo would have been obligated to cause DVRC to make a distribution that included those amounts. This court has regarded similar claims as direct rather than derivative,[41] suggesting that an investor-level recovery could be warranted.

Another factor that could point to an investor-level remedy is the burden on Manheim. To satisfy an entity-level remedy, Manheim must pay $2,365,809.22. In an investor-level remedy, Manheim only would need to pay 30% of that amount to Bamford ($709,742.77), and 30% of that amount to Ban (also $709,742.77) for a total of $1,419,485.53.

---

[41] *See Sehoy Energy LP v. Haven Real Est. Gp., LLC*, 2017 WL 1380619, at \*8 (Del. Ch. Apr. 17, 2017) (declining to hold that claim for excessive loans was derivative where entity was "a mere pass through entity" such that the benefits "flow directly back to the investors"); *Anglo Am. Sec. Fund, L.P. v. S.R. Global Int'l Fund, L.P.*, 829 A.2d 143, 152–53 (Del. Ch. 2003) (same).

A factor weighing against an investor-level remedy is the role of WestCo, which owns 10% of DVRC. WestCo would benefit indirectly from 10% of an entity-level recovery, but Ban does not seek to include WestCo in an investor-level recovery. Bamford and Ban did not pursue this action on a class-wide basis, so it is not as easy as it might be to translate the entity-level remedy into an investor-level remedy. *Cf. Baker v. Sadiq*, 2016 WL 4375250, at *1–2 (Del. Ch. Aug. 16, 2016) (explaining how investor-level and entity-level remedies can act as substitutes and be converted from one to the other). No one has addressed whether the court could realign WestCo as a plaintiff for purposes of receiving its share of the remedy.[42]

Conceptually, enabling WestCo to receive that recovery would stand in tension with this decision's rejection of the plaintiffs' efforts to assert claims that belong to WestCo. Either the court should engage with the real relations among the parties and address the injuries to WestCo, or it should pass and treat this case as a traditional derivative action involving DVRC.

On balance, the court will not take the step of awarding an investor-level remedy. An entity-level remedy in this case is straightforward and efficient. The court need not deviate from the well-trod path.

---

[42] Alternatively, the court could decline to address WestCo's rights, recognizing that WestCo could bring a separate action to recover its share of the recovery and invoke principles of issue preclusion against Manheim. Because Manheim owns 70% of WestCo and controls it, a demand to cause him to assert WestCo's claim would be futile, so Ban could cause WestCo to pursue it.

### 4.     The Invalidation Of WestCo's 10% Interest

In addition to a monetary remedy, Bamford and Ban ask the court to find that Manheim, Ban, and Bamford agreed in connection with the Reorganization that each would own one-third of DVRC's equity. To implement that agreement, Ban and Bamford ask the court to invalidate the 10% interest in DVRC that WestCo retained in the Reorganization. At the conclusion of trial, the court flagged this as an open issue. Tr. 1157.

Having considered the parties' arguments, the court finds that WestCo retained a 10% interest in DVRC and that there is no persuasive reason to deprive WestCo of that interest. The Admission Agreement expressly provides for that outcome, and Bamford and Ban each signed the Admission Agreement. They agreed to have WestCo retain a 10% interest.

As noted, Bamford and Ban have argued that Manheim represented that they each would own a one-third interest in DVRC, rather than WestCo owning a 10% interest and Manheim, Bamford, and Ban sharing a 90% interest. *See* Bamford Tr. 24–25; Ban Tr. 213. The Admission Agreement contains an integration clause which provides that it

> constitutes the entire agreement between the parties with respect to its subject matter and supersedes any and all other previous or contemporaneous communications, representations, understandings, agreements, negotiations, and discussions, either oral or written or oral agreements, understandings, or representations, directly or indirectly related to this Agreement, that are not set forth in this Agreement.

JX 452 § 6. In light of the integration clause, Ban and Bamford cannot rely on an unwritten understanding. If Ban and Bamford wanted to cut out WestCo or convert WestCo's interest

122

into a non-economic one, they should have provided for that result in the Admission Agreement.

Regardless, the record does not support the existence of an unwritten understanding. The court has found that Manheim did not make any misrepresentations to Ban or Bamford in connection with the Reorganization. FF ¶ 51. That includes not making a misrepresentation that they each would receive a one-third interest in DVRC.

As among themselves, Manheim, Ban, and Bamford may have referred colloquially to having equal ownership, and perhaps Ban and Bamford understood that to mean that they each would receive a third. If they did, then their understanding was unreasonable. The Admission Agreement clearly provides that WestCo retained a 10% interest as a managing member and that Manheim, Ban, and Bamford each received a 30% non-managing interest.

At trial, Manheim provided a credible explanation for retaining WestCo as DVRC's managing member with a 10% member interest. He pointed out that Mandle continued to own a 15% interest in WestCo. It was one thing to dilute her interest through the Reorganization. It was another to eliminate WestCo's status as a member and cut her out entirely. *See* Manheim Tr. 537. It is possible to discount that explanation as a makeweight excuse. It would have been easy to eliminate WestCo from the structure and preserve Mandle's share by giving her a 1.5% interest in DVRC. The person who benefitted most from retaining WestCo's 10% interest in DVRC was Manheim, because he owned 70% of

that entity. But Manheim's explanation is plausible, and it provides another reason for rejecting the plaintiffs' position.

There is no justification for disturbing the Reorganization and eliminating WestCo's interest. WestCo retains a 10% managing member interest in DVRC.

### 5. An Order Terminating Manheim's Control

In their most aggressive request for relief, the plaintiffs ask the court to terminate Manheim's control over DVRC by removing WestCo as DVRC's managing member, removing ReathCo as Penfold's general partner, and replacing each with a board consisting of Manheim, Bamford, and Ban. The plaintiffs have come nowhere close to proving facts that would support such an extraordinary remedy.

From the outset, Manheim has always had control of the EB-5 Business. He established WestCo as an entity that he controlled, and he made WestCo the sole member of DVRC. Manheim was willing to share the economic returns with Ban through the Ban Profit-Sharing Agreement, but he was not willing to give up control. Manheim accepted financing from Bamford for WestCo in the form of convertible debt, but he ensured that he could repay the debt to prevent Bamford from being able to take control of WestCo. In the Admission Agreement, Manheim provided for WestCo to continue as the managing member of DVRC and for the 90% interest that he shared equally with Ban and Bamford to be a non-managing member interest. Through the Contribution Agreement, Manheim, Ban, and Bamford placed their interests in Penfold, an entity in which they were limited

124

partners. Manheim thus has always been in control of the EB-5 Business. Ban and Bamford understood that and accepted it.

If Manheim had abused his control pervasively, then the court might consider appointing a receiver or exploring other equitable remedies. The plaintiffs have not shown a level of wrongdoing sufficient to deprive Manheim of control. Manheim is guilty of taking too much money out of the EB-5 Business, which is something he has done since the venture's early days. That shortcoming can be remedied through an award of damages. Further relief is not necessary.

### III. CONCLUSION

Manheim breached his fiduciary duty to DVRC. He is liable to DVRC for the following amounts:

| Category | Amount |
|---|---|
| Excess Management Fees | $1,776,203.00 |
| Compensation to Mandle | $442,205.82 |
| Improper Expenses | $147,400.40 |
| Total | $2,365,809.22 |

Manheim is also liable for pre- and post-judgment interest on these amounts, compounded quarterly at the legal rate.

Within thirty days, the parties will submit a proposed final judgment that has been agreed as to form. If there are issues that need to be addressed before a final judgment can be entered, then the parties will submit a joint letter outlining those issues and proposing a schedule for their resolution.